## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| CREATIVEMASS HOLDINGS, INC. *et. al.*, | Case No. 25-10695 (___) |
| Debtors.[1] | Joint Administration Requested |
|  | (Subchapter V) |

## DECLARATION OF CLAUDIA Z. SPRINGER
## IN SUPPORT OF PETITIONS AND FIRST DAY RELIEF

I, Claudia Z. Springer, hereby declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of Creativemass Holdings, Inc. ("Creativemass") and Creativemass Enterprises US LLC ("Creativemass US," together with Creativemass, the "Debtors").

2.      I was appointed by Creativemass' sole director, Mr. Alex Ulrich, as the Debtors' CRO on April 4, 2025.  I am a Principal of Novo Advisors, LLC ("Novo"). Novo is a financial advisory firm that offers performance improvement, liquidity management, turnaround and restructuring services[2] and fiduciary services. I have over 40 years of experience in corporate restructuring.[3]

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Creativemass Holdings, Inc. (2172) and Creativemass Enterprises US LLC (9046).  The Debtors' mailing address is 1209 N Orange Street, Wilmington, DE 19801.

[2]      Novo consultants have served as interim management, including Chief Restructuring Officer(s), on numerous occasions for its clients, and lead engagement teams focused on providing liquidity solutions, transaction or M&A diligence advisory and restructuring processes both in and out of court. Novo currently has more than thirty professionals employed by the firm.

[3]      Prior to joining Novo, I practiced bankruptcy and restructuring law for over forty (40) years, where I was a partner at Reed Smith LLP for almost twenty (20) years.  During my legal career, I represented major constituents in restructuring and bankruptcy cases including debtors, major creditors, shareholders, boards of directors, creditors' committees, landlords, buyers of assets, plan sponsors, bondholders, guarantors and

3.      I am generally familiar with the Debtors' financial affairs and books and records.

4.      Except as otherwise indicated, the statements set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' available books and records, information learned from my review of relevant documents, information supplied to me from the Debtors' director, Mr. Ulrich, or my own opinion based on my knowledge, experience, and information concerning the Debtors' financial condition.  I am authorized to submit this declaration on behalf of the Debtors.  If called to testify, I could and would testify competently to the matters set forth in this First Day Declaration.

5.      On April 8, 2025, the Debtors initiated a solicitation process to vote on the *Debtors' Joint Prepackaged Subchapter V Plan of Liquidation* (the "Plan"),[4] filed contemporaneously herewith, pursuant to section 1125(g) of the Bankruptcy Code.

6.      On April 14, 2025 (the "Petition Date"), the Debtors filed a voluntary petition commencing these chapter 11 cases (the "Chapter 11 Cases").  The Debtors are eligible, and have elected, to proceed under Subchapter V of title 11 of the United States Code (the "Bankruptcy Code").

7.      The Debtors have filed various motions identified herein requesting "first day" relief.  I submit this First Day Declaration in support of such first day relief, as well as to provide

---

others.  Additionally, my former practice included litigating as well as mediating many different types of disputes among various parties, including those pertaining to the exercise of remedies, breaches of contracts, lender liability, lease terminations, product recalls and liability, and labor and employment issues.

Finally, I have been named as one of America's leading insolvency and corporate restructuring attorneys by Chambers USA: America's Leading Business Lawyers over a dozen times and I have been recognized on numerous occasions as one of the nation's top restructuring and bankruptcy lawyers by America's Best Lawyers and America's Best Business Lawyers.

[4]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan or Solicitation Motions, as applicable.

support for, and background concerning, the Chapter 11 Cases and other pleadings filed or expected to be filed in Chapter 11 Cases.

## I.    OVERVIEW OF THE DEBTORS' BUSINESS, PRIOR TO CESSATION, AND CURRENT STATE OF FINANCIAL AFFAIRS
### A.    The Debtors' Business, Prior to Cessation.

8.    Founded in June 2020, Creativemass is a Delaware holding company that oversaw five subsidiaries (the "Subsidiaries," and together with Creativemass, the "Creativemass Group") while they were operational: (i) Creativemass Enterprises Pty Ltd.  ("Creativemass Enterprises"); (ii) Wealthconnect (Japan) Co., Ltd. ("Wealthconnect (Japan)"); (iii) Wealthconnect UK Ltd. ("Wealthconnect UK"); (iv) Stackup Risk Pty Ltd. ("Stackup"); and (v) Creativemass US.

9.    Creativemass Enterprises was incorporated on June 12, 2017 as an Australian corporation.  Its sole director was Michael Rouse, who also served as the sole director of Creativemass after its formation in 2020.  The Creativemass Group enterprise was centered around and reliant on the operations of Creativemass Enterprises.  Between 2017 to 2019, Creativemass Enterprises entered into a development process by scoping, testing and building products, with its flagship product being WealthConnect, a wealth management software application.  The Creativemass Group was managed by a team of financial services and technology professionals that aimed to leverage the latest technologies to provide advice and wealth solutions to the financial services industry through various products like WealthConnect, InvestorConnect and WealthConnect.com.  In 2020, Creativemass Enterprises sold WealthConnect licenses to customers using a subscription-based model.

10.    As discussed in more detail below, the Creativemass Group began experiencing financial distress beginning in or about 2019 as the result of multiple circumstances and events. This distress spread to Creativemass after its formation in 2020, and resulted in Mr. Rouse and

management taking several measures in 2022 in an attempt to turn around the Creativemass Group's losses, including with respect to Creativemass' capital structure. By early 2023, after losing confidence in management, creditors forced the exit of Mr. Rouse from the Creativemass Group, and a former director of Creativemass Enterprises, Alex Ulrich, was appointed as Creativemass' sole director. Further attempts to restructure the Creativemass Group's debts were undertaken, but on March 15, 2023, Creativemass Enterprises was placed into voluntary administration under Australian insolvency law. On April 28, 2023, Michael Hogan and Chistian Sprowles, of the firm of HoganSprowles (the "Australian Liquidators") were appointed as joint and several liquidators of Creativemass Enterprises (the "Australian Administration"). The Australian Administration currently remains pending.

11.     Following the collapse of Creativemass Enterprises and the Australian Administration, the remaining members of the Creativemass Group became dormant and/or are in the process of winding down. The Creativemass Group, including the Debtors, no longer has active employees or independent contractors. Rather, Mr. Ulrich remains Creativemass' sole director, and I serve as its CRO. Creativemass US's sole remaining officer is Mr. Rodrigo Gonzalez, who serves as the secretary.

**B.     The Debtor's Capital Structure**

12.     Creativemass is a corporation organized under the laws of Delaware. Creativemass US is a limited liability company organized under the laws of Delaware.

13.     There are approximately 14,451,751 shares of Creativemass common stock (the "Common Stock" or the "Outstanding Shares").

14.     As of the Petition Date, the Debtors have no secured creditors.

15. The Debtors have approximately $2,102,998.89 in unsecured debt, consisting mostly of noteholder, vendor, and credit card debt (the "Unsecured Debt").

16. Upon information and belief, the Debtors are not parties to any non-residential, real property leases.

17. Lastly, the Debtors are no longer operational.

## II. EVENTS LEADING TO FILING THE CHAPTER 11 CASES

### *Financial Disarray*

18. From 2017 to 2019, Creativemass Enterprises entered the product development stage by scoping, testing and building products. Creativemass Enterprises' flagship product was WealthConnect, a wealth management application which operates on Salesforce's cloud infrastructure. In 2020, Creativemass Enterprises commenced selling WealthConnect licenses to customers on a subscription-based model generally in terms of five years or greater, with pricing based on the level of functionality required. The Creativemass Group also generated revenue from its implementation and managed services.

19. Creativemass was created and formed in 2020. As with Creativemass Enterprises, Mr. Rouse was the sole director of Creativemass. Between 2021 and 2022, Creativemass conducted various capital raises, pursuant to which it raised approximately $25 million (USD). It was unable, however, to complete a contemplated capital raise of approximately $70 million (USD) with Goldman Sachs, the failure of which had a significant negative impact on cashflow and operations. One of the main reasons for Creativemass' need for capital was a dramatic increase in the staff headcount across the Creativemass Group—from 30 employees to over 220 employees—and the resulting increase in employee wages.[5]

---

[5]     In 2022, Creativemass Enterprises reported negative EBITDA of approximately $4.805 million AUD, predominately due to a substantial increase in overhead costs from increases in headcount and associated

20.     In addition to the capital raises, Harvest Lane Absolute Return Fund and National Nominees at Sydney University (together, the "Sydney Syndicate") provided several rounds of funding in the form of convertible notes.  These capital raises and convertible note offerings were performed in an effort to keep Creativemass Enterprises afloat until the fully approved R&D Claim payment hit Creativemass Enterprises's balance sheet.[6]

21.     Because of the negative EBITDA, Ernst & Young commenced an audit and concluded that Creativemass Enterprises' ability to survive as a going concern was in doubt.  From March to July 2022, eight (8) employees provided short-term bridge loans to Creativemass Enterprises totaling approximately $1.408 million to cover working capital requirements (the "Bridge Loans").

22.     In an effort to alleviate Creativemass' financial distress, in late 2022 its board proposed a recapitalization whereby a majority of the outstanding Creativemass Convertible Promissory Notes ("Convertible Notes") would be converted to Equity and holders of such Convertible Notes would receive shares in Creativemass proportional to the face amount of their debt (the "Note to Equity Conversion").  The Note to Equity Conversion was approved by a majority vote of Class A common stockholders and on or about December 24, 2022, pursuant to Section 4 of the Creativemass Convertible Promissory Note Purchase Agreement, which was

---

salaries and wages, which accounted for approximately 80% of total expenditure.  The Australian Liquidators report that if one were to adjust the P&L for capitalized wages, the EBITDA loss would have been $11.3 million AUD.

[6]     Part of the issue during this time was that Creativemass Enterprises heavily relied upon the Australian Government's Research and Development Tax Scheme to help fund Creativemass Enterprises' investment in new technologies.  Without such government assistance, Creativemass Enterprises could not perform the necessary functionalities to bring products to market.  In 2022, Creativemass submitted a research and development claim for approximately $19 million AUS ("R&D Claim") with the Australian Taxation Office (the "ATO"), which was approved by the Australian government department that facilitates the Research and Development Tax Scheme.  The ATO processed the claim and sent partial payment in or around December 2022.

applicable to all Convertible Notes (the "<u>Convertible Note Agreement</u>"), the Note to Equity Conversion occurred.  The principal amount of Convertible Notes converted was approximately $5,717,527.

23.     Holders of the Convertible Notes that were subject to the Note to Equity Conversion were notified of the conversion on or about December 24, 2022. Thereafter, a number of Holders protested their conversion, many stating its impropriety because it occurred on or near the Convertible Notes' maturity date.  Upon information and belief, Creativemass' management responded by either excluding some, but not all, of the protesting Noteholders from the Note to Equity Conversion (approximately 5% of Convertible Notes were not converted as a result) or settling certain claims of improper conversion (approximately 1% of Convertible Notes were not converted based on some form of settlement).

24.     The Bridge Loans proved insufficient to stem Creativemass Enterprises' cash flow problems, and in January 2023, Creativemass Enterprises began to engage in substantive discussions with AMP Group Finance Services Ltd. ("<u>AMP</u>"), Equisolve Consulting, Ltd. ("<u>Equisolve</u>") and the Sydney Syndicate (together, the "<u>Consortium</u>") regarding emergency funding for working capital given anticipated 2023 fiscal year EBITDA of approximately negative $1.9 million.[7]  The Consortium, however, would not provide emergency funding unless Mr. Rouse resigned and forfeited his equity in Creativemass Enterprises and all other Creativemass Group entities.  Thus, on or about February 8, 2023, Mr. Rouse resigned as director of all Creativemass Group entities and forfeited his equity therein pursuant to an Exit Deed.[8]

---

[7]     The Australian Liquidators report that if one were to adjust the P&L for capitalized wages, the EBITDA loss would have been $15.2 million AUD.

[8]     Upon information and belief, since the forfeiture, Mr. Rouse has evaded all attempts to contact him, both informally or through formal court intervention and/or court orders.

25.    On or about February 10, 2023, AMP and Equisolve loaned $900,000 and $100,000, respectively, to Creativemass Enterprises, representing the first tranche of the Consortium's emergency funding.  This was followed by an additional $100,000 by AMP and $400,000 by Equisolve on or about February 27, 2023, representing the second tranche of the Consortium's emergency funding.  The purpose of the second tranche was to enable Creativemass Enterprises to fund payroll obligations and pay certain of Creativemass Enterprises's other outstanding obligations.  On or about March 7, 2023, the Sydney Syndicate loaned $333,000 to Creativemass Enterprises, representing the third tranche of the Consortium's emergency funding. After the foregoing loans, however, AMP and Equisolve declined to provide further funding. Shortly after receiving the third tranche, on or about March 9, 2023, Creativemass Enterprises received questions from the ATO in respect of the remaining R&D Claim of $13.5 million.  The ATO did not, however, provide a definitive answer as to when the remainder would be disbursed. Without that clarity, and with AMP and Equisolve having declined further funding requests, the Sydney Syndicate likewise ceased funding.  Left without needed capital infusions from the Consortium, on or about March 15, 2023, Creativemass Enterprises was placed into Australian Administration.

26.    Despite the Note to Equity Conversion and the emergency funding described above, financial distress persisted.  Following the ouster of Mr. Rouse, Mr. Ulrich was designated the sole director of Creativemass on or about April 12, 2023, pursuant to a vote of the holders owning a majority of the shares of common stock of Creativemass.  Because the main operating Subsidiary of Creativemass had been placed into Australian Liquidation, Creativemass was left with no option other than to wind down what was left of the Creativemass Group and maximize recovery for the

few remaining Holders of Convertible Notes that were not converted, the Holders of General Unsecured Claims and the hundreds of Holders of Equity Interests.

27.     That winddown process, however, was imperiled not only by the Creativemass Group's lack of revenue, which in and of itself created financial distress, but also the potential exposure to liability stemming from the actions of Mr. Rouse, including, but not limited to, the Note to Equity Conversion.  As discussed above, various converted Noteholders had already asserted that the conversion was improper, and Mr. Ulrich had no way of knowing whether other former Holders of Convertible Notes would likewise raise claims, either informally or by initiating court proceedings.

28.     Faced with a lack of capital or cash to support any continued operation or pay any debt and potential claims exceeding $5.7 million or more, options were explored to effectuate an orderly winddown while identifying, resolving, and to the extent possible, minimizing the Debtors' liability exposure.  Following the Australian Liquidators declaration of the first interim dividend in or around June 2024 (the "First Australian Dividend"), providing Creativemass with over $2 million in funds that would need to be distributed to Creditors and Holders of Equity Interests, paramount in the considerations of the best path forward was the need for a process overseen by a court.  Such a process would  enable a judicial forum to hear and resolve any challenges from former Holders of Convertible Notes that were converted to Equity Interests and, ultimately, approve and protect a distribution of the First Australian Dividend and any other assets to which the Debtors became entitled, such as  the Material Australian Dividend that will be distributed to Creativemass on or around May 26, 2025.

29.     Moreover, while the First Australian Dividend permitted a significant recovery for Creativemass stakeholders, it was insufficient to resolve the financial distress that the Debtors

would face in their winddown efforts including the continued accrual of interest on Convertible Notes.

30.    Faced with this, Mr. Ulrich, concerned about the precarious financial condition of Creativemass left by its prior management, decided to explore, with counsel, the possibility of court oversight in connection with a distribution of the remaining Assets.  It was determined that the best route was to formulate a plan to distribute the Assets while also attempting to abate any potential litigation that might occur as a result of the previous director's actions, of which there was and remains a material risk.  The financial state of Creativemass as well as the risk of potential litigation would jeopardize the Cash Funds available to pay Unsecured Noteholder Claims or the General Unsecured Claims or any new Allowed Claims should they arise and become Allowed through these Chapter 11 Cases.

### *The Assignment for the Benefit of Creditors Proceeding*

31.    After retaining counsel and considering the options for a court process that would effectuate these goals, Creativemass sought to embark on a final liquidation path that would allow its Creditors and Holders of Equity Interests, as well as the remaining creditors of Creativemass US, to recover as much as possible in respect of their Claims and Equity Interests.  It was determined that the most efficient path for effectuating an orderly wind down and liquidation of Assets in a way that maximized recoveries for all Creditors and Equity Holders was to commence a liquidation process pursuant to an assignment of its Assets for the benefit of creditors under Delaware state law.  On October 4, 2024, Creativemass entered into that certain Trust Agreement and Assignment for the Benefit of Creditors of Creativemass Holdings, Inc. (the "Trust and Assignment Agreement") with Novo, as Assignee.  Pursuant to the Trust and Assignment

Agreement, Creativemass assigned all of its Assets, consisting at the First Australian Dividend, to Novo for the general benefit of Creativemass' Creditors and Holders of Equity Interests.

32.    On November 1, 2024, Novo filed its Petition for Assignment of Benefit of Creditors (the "ABC Petition") in the Court of Chancery for the State of Delaware (the "Delaware Chancery Court"), Case No. 2024-1131-PAF (the "ABC").  Novo's ultimate goal with respect to the ABC was to vet its assets and liabilities in a process overseen by the Chancery Court and then distribute the First Australian Dividend, first to Creativemass' creditors, with any remaining funds going to Creativemass' holders of equity on a *pro rata* basis.  However, on November 19, 2024, the Delaware Chancery Court denied the ABC Petition in a one-page order.  That order raised the issue, but did not ultimately decide, whether an assignment proceeding in the Delaware Chancery Court was needed given that, on paper, Creativemass' assets exceeded its liabilities (which, to my knowledge, is not a requirement under applicable Delaware law).  It did not, however, address, acknowledge or resolve the potential liability to which Creativemass was exposed in connection with, among other things, the Note to Equity Conversion.  As a result of the Chancery Court's decision, and after assessing the potentially massive expense and uncertainty of litigating such issues with respect to the denial in state court, Creativemass, in its reasonable business judgment, pivoted from the ABC to a Plan under subchapter V of the Bankruptcy Code to allow the necessary vetting of its Assets and liabilities, including potential litigation exposure, and to maximize recoveries for Creditors and Equity Holders while effectuating an orderly distribution of the Cash Funds and the to-be received Material Australian Dividend.  Creativemass US's filing will likewise permit distribution on account of claims against it in accordance with the Bankruptcy Code.

33.    Following the Commencement Date, Novo intends to file a notice of voluntary dismissal of the ABC Petition in the Delaware Chancery Court.  Moreover, pursuant to section

543 of the Bankruptcy Code, upon the Debtors' bankruptcy filing Novo will be required to turn over any and all Creativemass property assigned to it, thereby causing the reversion of the Cash Funds to Creativemass on the Petition Date.

## III. THE DEBTORS' REMAINING OPERATIONS

34.     The Debtors have both ceased operations and the only remaining operations are focused on winding down and confirming a Plan of Liquidation.

## IV. FIRST DAY MOTIONS, PLAN AND PLAN RELATED DOCUMENTS

35.     Concurrently with the filing of its chapter 11 petitions, the Debtors have filed a number of motions identified herein requesting "first day" relief (the "First Day Motions") that the Debtors believe are necessary to enable it to maximize the value of its estates while the Chapter 11 Cases are pending.

36.     The facts set forth in the First Day Motions are incorporated herein in their entirety. The Debtors request that the Court grant the First Day Motions as critical elements in ensuring a smooth and orderly administration of the Debtors' remaining during the pendency of these Chapter 11 Cases.

37.     I have reviewed each of the First Day Motions, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information, and belief with appropriate reliance on the Debtor's personnel and advisors.  To this end, the Debtors have filed the following First Day Motions:

    i.    *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*;

    ii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Prepetition Bank Account and Payment Methods, (II) Scheduling a Final Hearing and (III) Granting Related Relief*;

    iii.    *Motion of Debtors for Entry of an Order Authorizing the Debtors to Redact Certain Personally Identifiable Information and Granting Related Relief*;

iv.  *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent; and*

v.  *Motion for Entry of an Order Scheduling a Confirmation Hearing; (II) Establishing Plan Objection Deadlines and Related Procedures; (III) Approving Solicitation Procedures and Form of Ballot; (IV) Directing that a Meeting of the Creditors Not be Convened; (V) Waiving Rule 2015.3 Reports; (VI) Waiving the Requirement of Filing Schedules of Assets and Liabilities and Statement of Financial Affairs; (VII) Waiving the Requirement of Filing Status Report and Directing a Status Conference Not be Held; (VIII) Setting the Bar Date; and (IX) Granting Related Relief.*

38.   It is my belief that the relief sought in each of the First Day Motions is necessary for a successful wind down and to maximize Creditor and Equity Interests recoveries.  The relief requested in the First Day Motions is a critical component of the confidence of key constituencies necessary to implement a successful chapter 11 process.

39.   Given the pre-packaged nature of these Chapter 11 Cases, the First Day Motions are critical to ensuring a cost-efficient administration of the Debtors' Assets.

40.   Finally, the Debtors also filed the *Debtors' Joint Prepackaged Subchapter V Plan of Liquidation* (the "Plan")[9] which sets forth in detail of the treatment of the Professional Fee Claims, Unsecured Noteholder Claims, General Unsecured Claims and also the treatment of the Holders of Equity Interests. The following chart sets forth the proposed treatment as contemplated in the Plan:

| | |
|---|---|
| **Administrative Expense Claims and Professional Fees** | Allowed Professional Fee Claims that are due and owing as of the Confirmation Date shall be paid one hundred percent (100%) in Cash, from the Professional Fee Escrow Account. Further, each Professional who holds a Professional Fee Claim shall be required to File with the Bankruptcy Court, and to serve on all parties required to receive notice, a final fee application on or before the Professional Fee Bar Date. A Professional Fee Claim with respect to which a fee application has been properly and timely filed pursuant to this Article 2 shall be paid only to the extent Allowed by Final Order. Any objections to |

---

[9]   Capitalized terms not otherwise defined from here on shall have the same meaning ascribed to it in the Plan.

|  | Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of the final fee application for the for allowance and payment of Professional Fee Claim(s).<br><br>Once all Professional Fee Claims have been considered and Allowed by the Bankruptcy Court, the Debtors or the Plan Administrator, as the case may be, shall pay, after the application of any retainer amounts held by such Professional, such Allowed Professional Fee Claims as soon as practicable from the Professional Fee Escrow Account.<br><br>The Subchapter V Trustee shall be paid all fees due and owing as of the Confirmation Date and shall be paid one hundred percent (100%) in Cash, from the Professional Fee Escrow Account. |
|---|---|
| **Priority Tax Claims** | Payment through the Plan from the Plan Administrator Assets in full in Cash on the Effective Date. |
| **Unsecured Noteholder Claims** | Payment in full, in Cash, from the Plan Administrator Assets in Q3 2025 or as soon as practicable after the Debtors receive the Material Australian Dividend.<br><br>Estimated Recovery Percentage: 100% (principal and accrued interest through Petition Date) |
| **General Unsecured Claims** | Payment in full, in Cash, from the Plan Administrator Assets in Q3 2025 or as soon as practicable after the Debtors receive the Material Australian Dividend<br><br>Estimated Recovery Percentage: 100% |

| | |
|---|---|
| **Equity Interests** | Equity Interests shall be forever cancelled, and Holders of Equity Interests shall receive, after accounting for the Plan Administrator Expenses and fully resolving any and all Disputed Equity Interests, (i) a *pro rata* Distribution on account of their Equity Interests from the Plan Administrator Assets remaining after payment of Professional Fee Claims, Administrative Expense Claims, Priority Tax Claims, Unsecured Noteholder Claims, and General Unsecured Claims, and (ii) a *pro rata* Distribution on account of what was formerly Michael Rouse's Equity.<br><br>If after the Material Australian Dividend is received by the Debtors the Australian Liquidators declare another interim dividend and/or a final dividend, after accounting for the Plan Administrator Expenses, Holders of Equity Interests shall receive (i) a *pro rata* Distribution on account of their Equity Interest, and (ii) a *pro rata* portion of what was formerly Michael Rouse's Equity from any additional declared dividend |

## **CONCLUSION**

41.     I believe approval of the relief requested in the First Day Motions and the Other

Motions are in the best interests of all stakeholders and respectfully request that the Court grant all

relief requested in the First Day Motions and the Other Motions (in due course) and such other

further relief as may be just.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.

Dated: April 14, 2025
     Philadelphia, PA                                  */s/ Claudia Z. Springer*
                                                 Claudia Z. Springer, CRO