## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| CREATIVEMASS HOLDINGS, INC. *et. al.*, | Case No. 25-10695 (___) |
| Debtors.[1] | Joint Administration Requested |
| | (Subchapter V) |

## DEBTORS' JOINT PREPACKAGED
## SUBCHAPTER V PLAN OF LIQUIDATION

**PASHMAN STEIN WALDER HAYDEN, P.C.**
824 North Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 592-6496
Joseph C. Barsalona II (No. 6102)
Michael Custer (No. 4843)
Alexis R. Gambale (No. 7150)
Email: jbarsalona@pashmanstein.com
        mcuster@pashmanstein.com
        agambale@pashmanstein.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: April 8, 2025

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Creativemass Holdings, Inc. (2172) and Creativemass Enterprises US LLC (9046).  The Debtors' mailing address is 1209 N Orange Street, Wilmington, DE 19801.

**DEBTORS' JOINT PREPACKAGED SUBCHAPTER V PLAN OF LIQUIDATION**

This Plan is presented to you to inform you of the plan for liquidating and distributing the Debtors' Assets to pay their debts.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments.  To assist you in your review, please note that definitions of terms used herein and a section of frequently asked questions are at the end of this document in Articles 13 and 14. **Please note that capitalized terms used in this Plan and not defined in the instance of first use are defined in the Definitions section at the end of the Plan.**

## TABLE OF CONTENTS

**SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS** ................. 1

**ARTICLE 1** ................................................................................................................. 1

**HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTORS** ..................... 1

    **1.1**    **Nature and History of the Debtors' Business** ............................................... 1

    **1.2**    **Filing of the Debtors' Chapter 11 Cases.** .................................................... 2

    **1.3.**    **Legal Structure and Ownership.** ................................................................. 3

    **1.4**    **Debtors' Assets.** ........................................................................................... 3

    **1.5**    **Debtors' Liabilities.** .................................................................................... 3

    **1.6.**    **Current and Historical Financial Conditions.** ............................................ 4

    **1.7.**    **Events Leading to Filing These Chapter 11 Cases.** .................................... 4

    **1.8**    **Anticipated Significant Events During these Chapter 11 Cases.** ................ 7

    **1.9**    **Projected Recovery of Avoidable Transfers** ............................................... 8

**ARTICLE 2** ................................................................................................................. 9

**THE PLAN** ................................................................................................................. 9

    **2.1**    **Unclassified claims.** .................................................................................... 9

        **A. Administrative Expense Claims and Professional Fees** ...................... 9
        **B. Priority Tax Claims.** ........................................................................... 11

    **2.2**    **Classes of Claims and Equity Interests.** .................................................. 12

        **A. Class 1.A - Unsecured Noteholder Claims** ......................................... 13
        **B. Class 1.B -  General Unsecured Claims** ............................................. 14
        **C. Class 2 - Holders of Equity Interests** ................................................. 14

    **2.3**    **Claim and/or Equity Interest Objections** ................................................. 15

    **2.4**    **Treatment of Executory Contracts and Unexpired Leases** ...................... 15

    **2.5**    **Means for Implementation of the Plan.** .................................................... 16

    **2.6**    **Payments** .................................................................................................... 16

    **2.7**    **Post-Confirmation Management** ............................................................... 16

    **2.8**    **Tax Consequences of The Plan** ................................................................ 16

**ARTICLE 3** ................................................................................................................ **16**

    **THE PLAN ADMINISTRATOR** ............................................................................ **16**

      **3.1**   **Powers of the Plan Administrator** ................................................................ **16**

      **3.2**   **Appointment of the Plan Administrator** ...................................................... **17**

      **3.3**   **The Plan Administrator's Compensation** ................................................... **17**

      **3.4**   **The Plan Administrator's Professionals** ..................................................... **17**

      **3.5**   **The Plan Administrator's Indemnification** ................................................. **17**

**ARTICLE 4** ................................................................................................................ **17**

    **SUBSTANTIVE CONSOLIDATION** ..................................................................... **17**

**ARTICLE 5** ................................................................................................................ **18**

    **FEASIBILITY OF PLAN** ......................................................................................... **18**

      **5.1**   **Ability To Initially Fund Plan** ...................................................................... **18**

      **5.2**   **Ability To Make Plan Payments** ................................................................... **18**

**ARTICLE 6** ................................................................................................................ **19**

    **LIQUIDATION ANALYSIS** .................................................................................... **19**

**ARTICLE 7** ................................................................................................................ **19**

    **NO DISCHARGE OF DEBTORS** ........................................................................... **19**

**ARTICLE 8** ................................................................................................................ **19**

    **PROVISIONS GOVERNING DISTRIBUTIONS** .................................................. **19**

      **8.1**   **Distribution on Account of Claims Allowed as of the Effective Date** ............ **19**

      **8.2**   **Distribution on Account of Claims Allowed After the Effective Date** ............ **19**

          **(a)** *Payments and Distributions on Disputed Claims.* ............................................. **19**

          **(b)** *Special Rules for Distributions to Holders of Disputed Claims.* ...................... **20**

      **8.3**   **Timing and Calculation of Amounts to Be Distributed** ............................... **20**

      **8.4**   **Delivery of Distributions** .............................................................................. **20**

      **8.5**   **Distributions by the Plan Administrator** ..................................................... **20**

      **8.6**   **Undeliverable Distributions** ......................................................................... **21**

(a) *Holders of Certain Undeliverable Distributions.* ................................. 21

(b) *Failure to Claim Undeliverable Distributions* ................................. 21

(c) *Failure to Present Checks.* ................................. 21

(d) **Insufficient Information Regarding Holders of Equity Interests** ................. 21

8.7 **De Minimis Distributions** ................................. 22

8.8 **Compliance with Tax Requirements/Allocations** ................................. 22

8.9 **No Postpetition Interest on Claims** ................................. 23

**ARTICLE 9** ................................. 23

**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS OR EQUITY INTERESTS** ................................. 23

9.1 **Disputed Claims Process** ................................. 23

9.2 **Disputed Equity Interest Process** ................................. 23

9.3 **Allowance of Claims and Equity Interests** ................................. 24

9.4 **Claims and Equity Interests Administration Responsibilities** ................................. 25

**ARTICLE 10** ................................. 25

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ................................. 25

10.1 **Conditions Precedent to the Effective Date** ................................. 25

10.2 **Waiver of Conditions Precedent** ................................. 25

10.3 **Reservation of Rights** ................................. 26

10.4 **Substantial Consummation of Plan** ................................. 26

**ARTICLE 11** ................................. 26

**GENERAL PROVISIONS** ................................. 26

11.1 **Title to Assets** ................................. 26

11.2 **Binding Effect** ................................. 26

11.3 **Severability** ................................. 27

11.4 **Retention of Subject Matter Jurisdiction.** ................................. 27

11.5 **Captions** ................................. 27

11.6 **Modification of Plan.** ................................. 27

11.7 **Final Decree.** ................................. 27

**11.8  Compromise and Settlement of Claims and Controversies** ............................ 27

**11.9  Releases by the Debtors** ............................................................................... 28

**11.10 Releases by Holders of Claims** ..................................................................... 28

**11.11 Exculpation** ................................................................................................... 29

**11.12 Injunction Related to Third Parties** ............................................................... 29

**11.13 Term of Injunctions or Stays** ........................................................................ 30

**ARTICLE 12** ............................................................................................................ 30

    **ATTACHMENTS** ................................................................................................. 30

**ARTICLE 13** ............................................................................................................ 30

    **FREQUENTLY ASKED QUESTIONS** ............................................................... 30

**ARTICLE 14** ............................................................................................................ 32

    **DEFINITIONS** ..................................................................................................... 32

        **A. Scope of Definitions** ...................................................................... 32

        **B. Definitions** ..................................................................................... 32

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS AND HOLDERS OF EQUITY INTERESTS

Each of Creativemass and Creativemass US jointly propose this prepackaged subchapter V plan of liquidation for the resolution of outstanding Claims against and Equity Interests in the Debtors pursuant sections 1121(a) and 1189(a) of the Bankruptcy Code.

Unless otherwise provided under the Plan, subject to payment of all Administrative Expense Claims and Professional Fees, Creditors will receive full payment of their Allowed Claims and Holders of Equity Interests will receive their *pro rata* share of the Plan Administrator Assets remaining after Creditors are paid in full, as set forth in further detail below. Additionally, a Plan Administrator will be appointed pursuant to the terms of this Plan. The Plan Administrator will primarily be responsible for: (1) distributing the Plan Administrator Assets pursuant to this Plan; (2) investigating and, if the Plan Administrator deems it to be in the best interest of the Estates, prosecuting all Causes of Action, including Causes of Action against Insiders, if any, and (3) resolving Disputed Claims and Disputed Equity Interests, if they arise.

*For the avoidance of doubt*, Holders of Claims and Equity Interests are **not** required to file a Proof of Claim or Proof of Equity Interest, respectively, in order to receive a Distribution under the Plan. The Debtors shall make Distributions based on the Claims and Equity Interests denoted in their books and records and as set forth in this Plan and the Plan Supplement. If you have any questions regarding your Claim or Equity Interest, please contact proposed counsel to the Debtors, Pashman Stein Walder Hayden, P.C., using the contact information set forth in this Plan.

**ALL HOLDERS OF EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ARE STRONGLY ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE 1

## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTORS

### 1.1    Nature and History of the Debtors' Business.

Founded in June 2020, Creativemass is a Delaware holding company that oversaw five subsidiaries (the "Subsidiaries" and each a "Subsidiary," and together with Creativemass, the "Creativemass Group") while they were operational: (i) Creativemass Enterprises Pty Ltd. n/k/a A.C.N. 619 665 628 Pty Ltd ("Creativemass Enterprises"); (ii) Wealthconnect (Japan) Co., Ltd. ("Wealthconnect (Japan)"); (iii) Wealthconnect UK Ltd. ("Wealthconnect UK"); (iv) Stackup Risk Pty Ltd. ("Stackup"); and (v) Creativemass US.

Creativemass Enterprises was incorporated on June 12, 2017 as an Australian corporation. Its sole director was Michael Rouse, who also served as the sole director of Creativemass after its formation in 2020. The Creativemass Group enterprise was centered around and reliant on the operations of Creativemass Enterprises. Between 2017 and 2019, Creativemass Enterprises entered into a development process by scoping, testing and building products, with its flagship product being WealthConnect, a wealth management software application. The Creativemass

1

Group was managed by a team of financial services and technology professionals that aimed to leverage the latest technologies to provide advice and wealth solutions to the financial services industry through various products like WealthConnect, InvestorConnect and WealthConnect.com. In 2020, Creativemass Enterprises sold WealthConnect licenses to customers using a subscription-based model.

As discussed in more detail in Section 1.7 below, the Creativemass Group began experiencing financial distress beginning in or about 2019 as the result of multiple circumstances and events.  This distress spread to Creativemass after its formation in 2020, and resulted in Mr. Rouse and management taking several measures in 2022 in an attempt to turn around the Creativemass Group's losses, including with respect to Creativemass' capital structure.  By February 2023, certain creditors forced, and Mr. Rouse obliged, the exit of Mr. Rouse from the Creativemass Group. Further attempts to restructure the Creativemass Group's debts were undertaken, but on March 15, 2023, Creativemass Enterprises was placed into voluntary administration under Australian insolvency law (the "Australian Administration").  On March 15, 2023, Michael Hogan and Chistian Sprowles (collectively, the "Australian Liquidators") were appointed as joint and several liquidators of Creativemass Enterprises.  The Australian Administration currently remains pending, and during its pendency Alex Ulrich, a former director of Creativemass Enterprises, was appointed as Creativemass' sole director.

Following the Australian Administration, the remaining members of the Creativemass Group became dormant and/or are in the process of winding down. The Creativemass Group (which includes the Debtors) no longer has active employees or independent contractors.  Rather, Mr. Ulrich remains Creativemass' sole director, and Claudia Springer serves as its chief restructuring officer (the "CRO") pursuant to the *Omnibus Unanimous Written Consent of the Governing Bodies of Creativemass Holdings, Inc. & Creativemass Enterprises US LLC* dated April 4, 2025.  Creativemass US's sole remaining officer is Mr. Rodrigo Gonzalez, who serves as the secretary.

**1.2      Filing of the Debtors' Chapter 11 Cases.**

The Debtors intend to commence these Chapter 11 Cases and to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended (the "SBRA").

Prior to filing of the Chapter 11 Cases, the Debtors commenced a solicitation process whereby they, through the Claims, Noticing and Solicitation Agent, sent out (i) the Plan and Non-Voting Status and Opt-In Notice to the Holders of Unimpaired Unsecured Noteholder Claims and Unimpaired General Unsecured Claims, and (ii) Solicitation Packages to the Holders of Impaired Equity Interests for whom the Debtors either (a) had mailing addresses, or (b) had non-defunct email addresses.  After receiving the Plan and Non-Voting Status and Opt-In Notice, Holders of Unsecured Noteholder Claims and General Unsecured Claims will have the opportunity to complete and submit an Opt-In Form by the Voting Deadline. After receiving the Solicitation Packages, Holders of Equity Interests will have the opportunity to submit Ballots by the Voting Deadline to either accept or reject the Plan and to complete and submit an Opt-In Form by the Voting Deadline. The Opt-In Form, if signed, certifies that the Holder thereby grants the releases set forth in Section 11.10 of this Plan.

### 1.3.    Legal Structure and Ownership.

Creativemass is a corporation and Creativemass US is a limited liability company, both of which are organized under the laws of the State of Delaware.  Creativemass is the ultimate holding company owning 100% of each Subsidiary, including Creativemass US.  In turn, Creativemass is owned by Holders of Equity Interests.

### 1.4    Debtors' Assets.

As of the Solicitation Date, the Debtors' only current Asset is approximately $2,183,298.44 in cash (as such amount increases or decreases over the course of these Chapter 11 Cases, the "Cash Funds"),[1] held with Veritex Community Bank.  These funds are the proceeds of an interim dividend Creativemass received from the Australian Liquidators in the Australian Administration.[2]

### 1.5    Debtors' Liabilities.

As of the Solicitation Date, the Debtors have approximately $1,537,721.96 in unsecured debt from outstanding Convertible Notes, one holder of which is an "insider" as defined by section 101(31) Bankruptcy Code (the "Unsecured Noteholder Claims"):

| Name of Noteholder | Amount of Claim[3] |
|---|---|
| Ulrich Family Pty Ltd ATF The Ulrich Family Trust[4] | $279,254.34 |
| 0581 Pty Ltd ATF 0581 Investment Trust | $177,963.14 |
| Yuki Soga | $ 254,497.87 |
| Ritsuko Tsunoda | $645,317.67 |
| Mana Global PDE LTD | $180,688.95 |

Furthermore, as of the Solicitation Date, the Debtors have approximately $565,276.93 in unsecured debt from, among other things, credit card debt, unpaid settlement funds, legal fees and vendor debt (the "General Unsecured Claims"):

| Name of Creditor | Amount of Claim |
|---|---|
| Chase Bank | $490.25 |
| Gusto | $502.97 |

---

[1]    This amount does not include the Material Australian Dividend that will be declared and distributed on or about May 26, 2025, as discussed in Section 1.8 below. *See also* **Exhibit A**.

[2]    Because the Debtors' only asset is the Cash Funds, and to complete, file and serve schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") would be duplicative and will require a depletion of the Cash Funds, thereby curtailing the recovery of all stakeholders, the Debtors intend to seek a waiver of the general requirement to file Schedules and Statements.

[3]    These amounts include principal and accrued interest through and including the projected Commencement Date.

[4]    This claim is held indirectly by Mr. Ulrich, Creativemass' sole director.

| Ernst & Young | $57,116.36 |
| Foley & Lardner LLP | $127,190.80 |
| TBK CPA | $937.00 |
| Rosa Rios | $314,000.00 |
| American Express | $32,917.77 |
| Alfredo Miranda | $5,559.37 |
| Rodrigo Gonzalez | $26,562.41 |

### 1.6.  Current and Historical Financial Conditions.

*See* Sections 1.1, 1.4, 1.5 and 1.7 of the Plan for more detail.

### 1.7.  Events Leading to Filing These Chapter 11 Cases.

*Financial Disarray*

From 2017 to 2019, Creativemass Enterprises entered the product development stage by scoping, testing and building products. Creativemass Enterprises' flagship product was WealthConnect, a wealth management application which operates on Salesforce's cloud infrastructure. In 2020, Creativemass Enterprises commenced selling WealthConnect licenses to customers on a subscription-based model generally in terms of five years or greater, with pricing based on the level of functionality required. The Creativemass Group also generated revenue from its implementation and managed services.

Creativemass was created and formed in 2020.  As with Creativemass Enterprises, Mr. Rouse was the sole director of Creativemass. Between 2021 and 2022, Creativemass conducted various capital raises, pursuant to which it raised approximately $25 million (USD).  It was unable, however, to complete a contemplated capital raise of approximately $70 million (USD) with Goldman Sachs, the failure of which had a significant negative impact on cashflow. One of the main reasons for Creativemass' need for capital was a dramatic increase in the staff headcount across the Creativemass Group—from 30 employees to over 220 employees—and the resulting increase in employee wages.[5]

In addition to the capital raises, Harvest Lane Absolute Return Fund and National Nominees at Sydney University (together, the "Sydney Syndicate") provided several rounds of funding in the form of convertible notes.  These capital raises and convertible note offerings were done in an effort to keep Creativemass Enterprises afloat until the fully approved R&D Claim amount hit the balance sheet.[6]

---

[5]     In 2022, Creativemass Enterprises reported negative EBITDA of approximately $4.805 million AUD, predominately due to a substantial increase in overhead costs from increases in headcount and associated salaries and wages, which accounted for approximately 80% of total expenditure.  The Australian Liquidators report that if one were to adjust the P&L for capitalized wages, the EBITDA loss would have been $11.3 million AUD.

[6]     Part of the issue during this time was that Creativemass Enterprises heavily relied upon the Australian

(Continued . . .)

Because of the negative EBITDA, Ernst & Young commenced an audit and concluded that Creativemass Enterprises' ability to survive as a going concern was in doubt. From March to July 2022, eight (8) employees provided short-term bridge loans to Creativemass Enterprises totaling approximately $1.408 million to cover working capital requirements (the "Bridge Loans").

In an effort to alleviate Creativemass' financial distress, in late 2022 its board proposed a recapitalization whereby a majority of the outstanding Creativemass Convertible Promissory Notes ("Convertible Notes") would be converted to Equity and holders of such notes would receive shares in Creativemass proportional to the face amount of their debt (the "Note to Equity Conversion"). The Note to Equity Conversion was approved by a majority vote of Class A common stockholders and on or about December 24, 2022, pursuant to Section 4 of the Creativemass Convertible Promissory Note Purchase Agreement (the "Convertible Note Agreement"), the Note to Equity Conversion occurred. The principal amount of Convertible Notes converted was approximately $5,717,527. Holders of the Convertible Notes that were subject to the Note to Equity Conversion were notified of the conversion on or about December 24, 2022.

The Bridge Loans proved insufficient to stem Creativemass Enterprises' cash flow problems, and in January 2023, Creativemass Enterprises began to engage in substantive discussions with AMP Group Finance Services Ltd. ("AMP"), Equisolve Consulting, Ltd. ("Equisolve") and the Sydney Syndicate (together, the "Consortium") regarding emergency funding for working capital given anticipated 2023 fiscal year EBITDA of approximately negative $1.9 million.[7] The Consortium, however, would not provide emergency funding unless Mr. Rouse resigned and forfeited his equity in Creativemass Enterprises and all other Creativemass Group entities. Thus, on or about February 8, 2023, Mr. Rouse resigned as director of all Creativemass Group entities and forfeited his equity therein pursuant to an Exit Deed.[8]

On or about February 10, 2023, AMP and Equisolve loaned $900,000 and $100,000, respectively, to Creativemass Enterprises, representing the first tranche of the Consortium's emergency funding. This was followed by an additional $100,000 by AMP and $400,000 by Equisolve on or about February 27, 2023, representing the second tranche of the Consortium's emergency funding. The purpose of the second tranche was to enable Creativemass Enterprises to fund payroll obligations and pay certain of Creativemass Enterprises's other outstanding obligations. On or about March 7, 2023, the Sydney Syndicate loaned $333,000 to Creativemass Enterprises, representing the third tranche of the Consortium's emergency funding. After the

---

Government's Research and Development Tax Scheme to help fund Creativemass Enterprises' investment in new technologies. Without such government assistance, Creativemass Enterprises could not perform the necessary functionalities to bring products to market. In 2022, Creativemass submitted a research and development claim for approximately $19 million AUS ("R&D Claim") with the Australian Taxation Office (the "ATO"), which was approved by the Australian government department that facilitates the Research and Development Tax Scheme. The ATO processed the claim and sent partial payment in or around December 2022.

[7]     The Australian Liquidators report that if one were to adjust the P&L for capitalized wages, the EBITDA loss would have been $15.2 million AUD.

[8]     Upon information and belief, since the forfeiture, Mr. Rouse has evaded all attempts to contact him, both informally or through formal court intervention and/or court orders.

foregoing loans, however, AMP and Equisolve declined to provide further funding. Shortly after receiving the third tranche, on or about March 9, 2023, Creativemass Enterprises received questions from the ATO in respect of the remaining R&D Claim of $13.5 million. The ATO did not, however, provide a definitive answer as to when the remainder would be disbursed. Without that clarity, and with AMP and Equisolve having declined further funding requests, the Sydney Syndicate likewise ceased funding. Left without needed capital infusions from the Consortium, on or about March 15, 2023, Creativemass Enterprises was placed into Australian Administration.

Despite the Note to Equity Conversion and the emergency funding described above, financial distress persisted. Following the ouster of Mr. Rouse, Mr. Ulrich was designated the sole director of Creativemass on or about April 12, 2023, pursuant to a vote of the holders owning a majority of the shares of common stock of Creativemass. Because the main operating Subsidiary of Creativemass had been placed into Australian Liquidation, Creativemass was left with no option other than to wind down the Creativemass Group and maximize recovery for the few remaining Convertible Noteholders that were not converted, the Holders of General Unsecured Claims and the hundreds of Holders of Equity Interests.

### The Assignment for the Benefit of Creditors Proceeding

Notwithstanding the economic collapse of the Subsidiaries, Creativemass sought to embark on a final liquidation path that would allow its Creditors and Holders of Equity Interests, as well as the remaining Creditors of Creativemass US, to recover as much as possible in respect of their claims and interests. After the appointment of Mr. Ulrich, Creativemass determined in late 2023 that the most efficient path for doing so was to commence a liquidation process pursuant to which an assignment of its assets for the benefit of creditors would occur under Delaware state law. Therefore, on October 4, 2024, Creativemass entered into that certain *Trust Agreement and Assignment for the Benefit of Creditors of Creativemass Holdings, Inc.* (the "Trust and Assignment Agreement") with Novo Advisors ("Novo"), as Assignee. Pursuant to the Trust and Assignment Agreement, Creativemass assigned all of its Assets, consisting at the time of only a dividend payment from the Australian Administration to Novo for the general benefit of Creativemass' Creditors and Holders of Equity Interests (the "Australian Distribution Proceeds").

On November 1, 2024, Novo filed its *Petition for Assignment of Benefit of Creditors* (the "ABC Petition") in the Court of Chancery for the State of Delaware (the "Delaware Chancery Court"), Case No. 2024-1131-PAF (the "ABC"). Novo's ultimate goal with respect to the ABC was to distribute the Australian Distribution Proceeds, first to Creativemass's Creditors, with any remaining funds going to Creativemass' Holders of Equity Interests on a *pro rata* basis. However, on November 19, 2024, the Delaware Chancery Court denied the ABC Petition in a one-page order. As a result, and to avoid the costly and uncertain proceedings through the Delaware courts, Creativemass pivoted from the ABC to a subchapter V bankruptcy proceeding to effectuate an orderly distribution of the Cash Funds. Creativemass US's filing will likewise permit Distribution on account of claims against it in accordance with the Bankruptcy Code.

Following the Commencement Date, Novo intends to file a notice of voluntary dismissal of the ABC Petition in the Delaware Chancery Court. Moreover, pursuant to section 543 of the Bankruptcy Code, upon the Debtors' bankruptcy filing Novo will turn over any and all

Creativemass property assigned to it, thereby causing the reversion of the Cash Funds to Creativemass on the Petition Date.

1.8    **Anticipated Significant Events During These Chapter 11 Cases.**

***First Day Relief***

The Debtors have taken a number of steps in preparation for these Chapter 11 Cases in order to implement the orderly liquidation and ultimate distribution of their Assets, including the forthcoming first day motions (collectively, the "First Day Relief"):

     i.    *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases;*

     ii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Prepetition Bank Account and Payment Methods, (II) Scheduling a Final Hearing and (III) Granting Related Relief;*

     iii.    *Motion of Debtors for Entry of an Order Authorizing the Debtors to Redact Certain Personally Identifiable Information and Granting Related Relief; and*

     iv.    *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent.*

In addition to the First Day Relief that will be sought in conjunction with this Plan, the Debtors have conditionally retained Pashman Stein Walder Hayden P.C. ("Pashman") and Novo to implement their liquidation in the Chapter 11 Cases, pursuant to the forthcoming retention applications:

     i.    *Application for Entry of an Order Under Section 327(a), 328(a), and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Rules 2014-1 and 2016 Authorizing Retention and Employment of Pashman Stein Walder Hayden, P.C. as Counsel for the Debtors Nunc Pro Tunc to the Petition Date; and*

     ii.    *Application of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Employ and Retain Novo Advisors, LLC and (B) Designate Claudia Z. Springer as Chief Restructuring Officer for the Debtors Effective as of the Petition Date; and (II) Granting Related Relief.*

In addition to the foregoing First Day Relief, as noted *supra*, the Debtors intend to file a motion that seeks, among other things, (a) a waiver of the requirement to file Schedules and Statements and reports under Rule 2015.3 of the Federal Rules of Bankruptcy Procedure in the Chapter 11 Cases, (b) approval of their solicitation procedures in light of the circumstances of the Chapter 11 Cases, (c) an order providing that a meeting of a creditors pursuant to section 341 of the Bankruptcy Code will not be convened, (d) a conditional waiver of the status report and status

hearing generally required under section 1188 of the Bankruptcy Code, and (e) an order setting the Confirmation Date as the Bar Date.

### *The Australian Administration and Additional Dividends*

As these Chapter 11 Cases proceed, the Australian Administration will continue concurrently. As outlined in the Hogan Sprowles Sixth Report to Creditors dated March 31, 2025 (the "Sixth Creditor Report"), attached hereto as **Exhibit A**, the Australian Liquidators are declaring an interim dividend to Ordinary Unsecured Creditors to be paid on or around May 26, 2025, with an estimated recovery of $0.11 cents on the dollar. As a result of the dividend declaration, Creativemass, as an Ordinary Unsecured Creditor, is expecting to receive an interim dividend of approximately $3,361,019 AUD, or $2,013,031.07 USD (the "Material Australian Dividend").[9] Once received, the Material Australian Dividend will be added to the Plan Administrator Assets and made available for Distribution pursuant to Section 2.2 of this Plan. To the extent Creativemass receives any additional dividends in the Australian Administration, such funds will likewise be added to the Plan Administrator Assets and made available for Distribution pursuant to Section 2.2 of this Plan.

### *Miscellaneous*

Furthermore, the Plan Administrator intends to set aside $15,000 from the Plan Administrator Assets to wind down Wealthconnect (Japan) ("Japanese Bankruptcy Funds"). The other Subsidiaries – Wealthconnect UK and Stackup – have either been separately wound down or completely abandoned without any remaining management.[10] The Plan Administrator has been advised by a former director of Wealthconnect (Japan), Chiyo Aoshima, that the cost to dissolve and fully wind down Wealthconnect (Japan) will be approximately $15,000. The Debtors view this expenditure as *de minimis* in relation to the Cash Funds to be distributed, a reasonable exercise of their business judgment as the sole shareholder of Wealthconnect (Japan) and will not prejudice the Estates.

### 1.9    Projected Recovery of Avoidable Transfers.

The Debtors have not yet performed a full analysis of potential preference, fraudulent conveyance, or other potential Avoidance Actions, although they do not believe that any such claims exist given the dormancy of their operations since early 2023.[11] To the extent any such actions are determined to be actionable, the Plan Administrator will make a determination

---

[9]   This amount may vary depending on the conversion rate on May 26, 2025. This figure contemplates a $0.60 conversion rate which is the rate as of April 8, 2025.

[10]   Former management of Stackup – Michael Rouse – has not been located.

[11]   To the extent any claims exist against Mr. Rouse, the Debtors note that the Australian Liquidators have been unsuccessful in locating or serving Mr. Rouse since the inception of the Australian Administration and the subsequent Australian bankruptcy proceedings against Mr. Rouse and his alleged co-conspirator. The Debtors will continue to analyze whether pursuit of Causes of Action against Mr. Rouse in addition to the efforts of the Australian Liquidators is likely to be value maximizing to the Estates.

regarding the potential benefit to be derived from a pursuit of such Avoidance Actions.

## ARTICLE 2

## THE PLAN

As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each Class will receive.  The Plan also states whether each class of Claims or Equity Interests is Impaired or Unimpaired.  A Claim or Equity Interest is Impaired if the Plan alters the legal, equitable or contractual rights to which the Holders of such Claims or Equity Interests are otherwise entitled.  If the Plan is confirmed, each Creditor's recovery is limited to the treatment set forth in the Plan.

### 2.1    Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code.  For example, Administrative Expense Claims and Priority Tax Claims are not classified.  They are not considered Impaired, and Holders of such Claims do not vote on the Plan. They may, however, object to Plan Confirmation if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan does not place the following Claims in any Class:

### A.    Administrative Expense Claims and Professional Fees

The Debtors must pay all Administrative Expense Claims in full on the later of (i) the Effective Date, or (ii) as soon as practicable when Allowed by the Bankruptcy Court, unless the Holder of an Administrative Expense Claim agrees to a different treatment. If an Administrative Expense Claim is disputed, the Bankruptcy Court must determine the validity and amount of the claim, referred to as determining the "allowance" of the Administrative Expense Claim. Any Administrative Expense Claim that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with the Plan, or upon such other terms as agreed upon by the Debtors and the Holder of such Administrative Expense Claim or court order.  If the Administrative Expense Claim is disputed, payment will be made after and in such an amount as is determined by the Bankruptcy Court.

In these Chapter 11 Cases, the only Administrative Expense Claims will be Allowed post-Petition fees and expenses incurred by Professionals, including the Allowed Claim for the Subchapter V Trustee for his or her fees and expenses, the Allowed Claim of any potential financial advisors and/or accountants employed upon Bankruptcy Court approval to render services to the Debtors during the course of these Chapter 11 Cases and the Debtors' legal professionals.

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) days after the Confirmation Date. Objections to any Professional Fee Claim must be Filed and served on the Debtors, the U.S. Trustee, the Subchapter V Trustee, and the applicable Professional within twenty-one (21) days after the filing of the final fee application with respect to the Professional Fee Claim. All such final requests will be subject to approval by the Bankruptcy Court after notice

and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied from the Cash Funds prior to any Distributions to Holders of Unsecured Noteholder Claims, Holders of General Unsecured Claims and Holders of Equity Interests.

### Professional Fees Incurred Prior to and as of the Confirmation Date

As soon as possible after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Plan Administrator to be added to the Plan Administrator Assets.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than seven (7) Business Days prior to the Effective Date; *provided that* such estimate shall not be considered an admission with respect to the fees and expenses of such Professionals and such Professionals are not bound to any extent by the estimates.  If a Professional fails to provide an estimate as specified above, the Debtors may estimate the unbilled fees and expenses of such Professional.

### Fees Incurred after the Confirmation Date

Upon the Confirmation Date, any requirement that Professionals retained in connection with and for services during the Chapter 11 Cases continue to comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Plan Administrator may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Plan Administrator, as the case may be, will, without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented professional fees and expenses incurred by the Debtors or the Plan Administrator from the Plan Administrator Assets.

The following chart lists the Debtors' estimated Administrative Expense Claims for Professionals and the Subchapter V Trustee through the Confirmation Date, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment | Estimated Recovery |
|---|---|---|---|
| Professional Fees, as approved by the Bankruptcy Court | Approximately $150,000.00 | Allowed Professional Fee Claims that are due and owing as of the Confirmation Date shall be paid one hundred percent (100%) in Cash, from the Professional Fee Escrow Account. <br><br> Further, each Professional who holds a Professional Fee Claim shall be required to File with the Bankruptcy Court, and to serve on all parties required to receive notice, a final fee application on or before the Professional Fee Bar Date. A Professional Fee Claim with respect to which a fee application has been properly and timely filed pursuant to this Article 2 shall be paid only to the extent Allowed by Final Order. Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of the final fee application for the for allowance and payment of Professional Fee Claim(s). <br><br> Once all Professional Fee Claims have been considered and Allowed by the Bankruptcy Court, the Debtors or the Plan Administrator, as the case may be, shall pay, after the application of any retainer amounts held by such Professional, such Allowed Professional Fee Claims as soon as practicable from the Professional Fee Escrow Account. | Estimated Recovery Percentage: 100% <br><br> Form of Recovery: Cash |
| Subchapter V Trustee | Approximately $10,000.00 | Payment of fees due and owing as of the Confirmation Date shall be paid one hundred percent (100%) in Cash, from the Professional Fee Escrow Account. | Estimated Recovery Percentage: 100% <br><br> Form of Recovery: Cash |
| **TOTAL** | Approximately $160,000.00 | | |

### B.    Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by section 507(a)(8) of the Code.  Unless the Holder of such Allowed Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding five (5) years from the date of the order for relief.

11

While the Debtors do not currently anticipate any such Claim, each Holder of a Priority Tax Claim, if any, will be paid as set forth in the chart below.

| Type | Estimated Amount Owed | Proposed Treatment | Estimated Recovery |
|---|---|---|---|
| Priority Tax Claims | $0.00 | Payment through the Plan from the Plan Administrator Assets in full in Cash on the Effective Date. | Estimated Recovery Percentage: 100%<br><br>Form of Recovery: Cash |

**2.2    Classes of Claims and Equity Interests.**

The classification of Claims against and Equity Interests in the Debtors pursuant to the Plan are as follows and discussed in more detail below:

| Class | Description | Treatment | Impairment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1.A[12] | Unsecured Noteholder Claims | Payment in full, in Cash, from the Plan Administrator Assets in Q3 2025 or as soon as practicable after the Debtors receive the Material Australian Dividend. | Unimpaired | No (Presumed to Accept) | Estimated Recovery Percentage: 100% (principal and accrued interest through Petition Date)<br><br>Form of Recovery: Cash |
| 1.B[13] | General Unsecured Claims | Payment in full, in Cash, from the Plan Administrator Assets in Q3 2025 or as soon as practicable after the Debtors receive the Material Australian Dividend. | Unimpaired | No (Presumed to Accept) | Estimated Recovery Percentage: 100%<br><br>Form of Recovery: Cash |

---

[12]    Classes 1.A & 1.B are only broken up in this chart for purposes of showing the two distinct types of unsecured debt (Convertible Notes debt and other debt – both of which are unsecured), but both Classes 1.A & 1.B are being treated identically and together make up Class 1.

[13]    *See* note 12, *supra*.

| 2 | Equity Interests | Equity Interests shall be forever cancelled, and Holders of Equity Interests shall receive, after accounting for the Plan Administrator Expenses and fully resolving any and all Disputed Equity Interests, (i) a *pro rata* Distribution on account of their Equity Interests from the Plan Administrator Assets remaining after payment of Professional Fee Claims, Administrative Expense Claims, Priority Tax Claims, Unsecured Noteholder Claims, and General Unsecured Claims, and (ii) a *pro rata* Distribution on account of what was formerly Michael Rouse's Equity.<br><br>If after the Material Australian Dividend is received by the Debtors the Australian Liquidators declare another interim dividend and/or a final dividend, after accounting for the Plan Administrator Expenses, Holders of Equity Interests shall receive (i) a *pro rata* Distribution on account of their Equity Interest, and (ii) a *pro rata* portion of what was formerly Michael Rouse's Equity from any additional declared dividend. | Impaired | Yes | Estimated Recovery Percentage: approximately 45%<br><br>Form of Recovery: Cash<br><br>*This amount is subject to the diminution of Plan Administrator Assets after the Confirmation Date due to payment of reasonable and documented professional fees and expenses incurred by the Debtors or the Plan Administrator and any Plan Administrator Expenses.* |

The following is a more complete discussion of the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

## A.    Class 1.A - Unsecured Noteholder Claims

Unsecured Noteholder Claims are not secured by property of the Estates and are not entitled to priority under section 507(a) of the Bankruptcy Code.  The following chart identifies the Plan's proposed treatment of Unsecured Noteholder Claims against the Debtors:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 1.A | Unsecured Noteholder Claims<br><br>Total amount of Claims: $1,537,721.96<br><br>(as set forth in Section 1.5 of the Plan) | Unimpaired (Presumed to Accept) | Payment in full,[14] in Cash, from the Plan Administrator Assets in Q3 2025 or as soon as practicable after the Debtors receive the Material Australian Dividend. |

### B.      Class 1.B - General Unsecured Claims

General Unsecured Claims are not secured by property of the Estates and are not entitled to priority under section 507(a) of the Bankruptcy Code. The following chart identifies the Plan's proposed treatment of General Unsecured Claims against the Debtors:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 1.B | General Unsecured Claims<br><br>Total amount of Claims: $565,276.93<br><br>(as set forth in Section 1.5 of the Plan) | Unimpaired (Presumed to Accept) | Payment in full, in Cash, from the Plan Administrator Assets in Q3 2025 or as soon as practicable after the Debtors receive the Material Australian Dividend. |

### C.      Class 2 - Holders of Equity Interests

Holders of Equity Interests are parties who hold an ownership interest (*i.e.*, equity interest) in Creativemass.  In a corporation, persons and entities holding preferred or common stock are Holders of Equity Interests.  The following chart sets forth the Plan's proposed treatment of Equity Interests:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 2 | Equity Interests | Impaired (Entitled to Vote) | Equity Interests shall be forever cancelled, and Holders of Equity Interests shall receive, |

---

[14]      Meaning payment of principal and interest (at the rate set forth in the respective Convertible Note) accrued through the Petition Date.

| | | | after accounting for the Plan Administrator Expenses and fully resolving any and all Disputed Equity Interests, (i) a *pro rata* Distribution on account of their Equity Interests from the Plan Administrator Assets remaining after payment of Professional Fee Claims, Administrative Expense Claims, Priority Tax Claims, Unsecured Noteholder Claims, and General Unsecured Claims, and (ii) a *pro rata* Distribution on account of what was formerly Michael Rouse's Equity. |
|---|---|---|---|
| | | | If after the Material Australian Dividend is received by Debtors the Australian Liquidators declare another interim dividend and/or a final dividend, after accounting for the Plan Administrator Expenses, Holders of Equity Interests shall receive (i) a *pro rata* Distribution on account of their Equity Interest, and (ii) a *pro rata* portion of what was formerly Michael Rouse's Equity from any additional declared dividend. |

It is important to note that because Michael Rouse consensually forfeited his Equity in all Creativemass Group entities, all other Holders of Equity Interests will also be receiving a *pro rata* Distribution on account of what was formerly Michael Rouse's Equity. **No Distribution(s) or payment(s) will be made to Michael Rouse or any entity associated with Michael Rouse on account of any Equity Interests he formerly held in the Debtors.**

### 2.3     Claim and/or Equity Interest Objections.

Should any Proof of Claim or Proof of Equity Interest be filed by the Bar Date, the Filed Proof of Claim or Proof of Equity Interest will be treated as a Disputed Claim or Disputed Equity Interest, respectively, under the Plan. *See* Sections 9.1 and 9.2 of the Plan. If and when a Disputed Claim and/or Disputed Equity Interest is finally resolved by the allowance of the Claim and/or Equity Interest in whole or in part, the Debtors or the Plan Administrator, as applicable, will pay the Allowed Claim and or Equity Interest in accordance with such resolution and the Plan.

### 2.4     Treatment of Executory Contracts and Unexpired Leases.

Upon information and belief, the Debtors are not parties to any Executory Contracts or Unexpired Leases that require rejection, assumption (*i.e.*, acceptance), or assumption and assignment to another party pursuant to section 365 of the Bankruptcy Code.

**2.5**      **Means for Implementation of the Plan.**

The Plan Administrator will implement the Plan through Distribution of the Plan Administrator Assets. Additionally, subject to the terms set forth in Article 3 of this Plan, the Plan Administrator shall act for the Debtors in the same fiduciary capacity applicable to a board of managers, directors, and officers (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).

**2.6**      **Payments.**

If the Plan is confirmed under section 1191(a) or (b) of the Bankruptcy Code, payments to Creditors provided for in the Plan will be made by the Plan Administrator.

**2.7**      **Post-Confirmation Management.**

The Debtors are liquidating and have ceased operations. Accordingly, there will be no post-confirmation management.

**2.8**      **Tax Consequences of the Plan.**

***Creditors and Holders of Equity Interests concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.***

## ARTICLE 3

## THE PLAN ADMINISTRATOR

**3.1**      **Powers of the Plan Administrator.**

Upon the Effective Date, the powers of the Plan Administrator shall include any and all powers and authority to administer and distribute the Plan Administrator Assets and prosecute Causes of Action, if any and deemed actionable by the Plan Administrator, including: (1) receiving, holding, investing, supervising, and protecting the Assets of the Debtors; (2) taking all steps to execute all instruments and documents necessary to effectuate the Distributions to be made under the Plan from the Plan Administrator Assets; (3) making Distributions of the Plan Administrator Assets; (4) investigating, prosecuting and resolving Causes of Action, if any were deemed actionable by the Plan Administrator, including Causes of Action against Insiders, objecting to Filed Claims, and resolving Disputed Claims and/or Disputed Equity Interests; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Debtors and the Estates; (7) setting aside the Japanese Bankruptcy Funds to enable the wind down of Wealthconnect (Japan) as set forth in Section 1.8 of the Plan; and (8) exercising such other powers as may be vested in him or her pursuant to an order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out his or her responsibilities under the Plan.

For the avoidance of doubt, whether and how to investigate, prosecute, or resolve any Cause of Action, object to Filed Proofs of Claim and/or Proofs of Equity Interest, or resolve Disputed Claims and/or Disputed Equity Interests, including entering into any settlement thereof, will be subject to the reasonable business judgment of the Plan Administrator.

### 3.2    Appointment of the Plan Administrator.

The Plan Administrator shall be named in the Plan Supplement and appointed effective as of the Effective Date. The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided that* such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon his or her appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtors and the Estates shall be terminated.

### 3.3    The Plan Administrator's Compensation.

The Plan Administrator's compensation, on a post-Confirmation Date basis, shall be made in the ordinary course of business at prevailing hourly rates from the Plan Administrator Assets, without need for notice, application to, or approval by the Bankruptcy Court.

### 3.4    The Plan Administrator's Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, financial advisors, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals ("Plan Administrator Expenses") shall be paid from the Plan Administrator Assets prior to any Distributions to Holders of Unsecured Noteholder Claims, Holders of General Unsecured Claims and Holders of Equity Interests. The payment of foregoing expenses shall be made in the ordinary course of business, without need for notice, application to, or approval by the Bankruptcy Court.

### 3.5    The Plan Administrator's Indemnification.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Debtors and the Estates. Notwithstanding anything to the contrary contained herein, the Plan Administrator in his or her capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors or the Estates.

## ARTICLE 4

## SUBSTANTIVE CONSOLIDATION

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order (consisting of the Confirmation Order) substantively consolidating the Debtors' Chapter 11 Cases for the

limited purpose of aggregating Claims and making Distributions. For all other purposes, this Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor in all respects other than for Distributions. Upon the entry of the Confirmation Order, the claims register, if any, maintained in the various Chapter 11 Cases shall be deemed consolidated into a single claims register in respect of the consolidated Estate. Further, Claims asserted against multiple Debtors, including Claims based on joint and several liability and guarantee and/or surety Claims shall be deemed to constitute a single Claim against the consolidated Estate. Thus, on the Confirmation Date, the Chapter 11 Cases of each of the Debtors shall be substantively consolidated for the limited purposes stated above. Subject to the occurrence of the Effective Date, (i) all Assets and Liabilities of Creativemass and Creativemass US shall be deemed merged or treated as though they were merged into and with the Assets and Liabilities of Creativemass, (ii) no Distributions shall be made under the Plan on account of Intercompany Claims, if any, among the Consolidated Debtors, (iii) all guarantees of any of the Consolidated Debtors of the obligations of any other Debtor shall be deemed eliminated so that any claim against any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Consolidated Debtors, and (iv) each and every Claim filed or to be filed in these Chapter 11 Cases against any of the Consolidated Debtors shall be deemed filed against the Consolidated Debtors, and shall be deemed one Claim against and obligation of the Consolidated Debtors.

## **ARTICLE 5**

## **FEASIBILITY OF PLAN**

The Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, or court intervention, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan.

### 5.1    **Ability To Initially Fund Plan.**

The Debtors believe that they will have sufficient Cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on or after the Effective Date or upon allowance thereof by the Bankruptcy Court, whichever is later. *See* **Exhibit A**.

Unless otherwise set forth in the Plan, pursuant to § 1191(c)(3) of the Bankruptcy Code, if the Debtors or the Plan Administrator, as the case may be, default in payments under the Plan, the affected Creditor or Holder of Equity Interest shall notify the Debtors or the Plan Administrator, as the case may be, who shall have twenty-one (21) days to cure the default. If the Debtors and/or Plan Administrator, as the case may be, do not cure such default within twenty-one (21) days, the affected Creditor or Holder of Equity Interest may file a notice of the default with the Court and request a hearing to consider appropriate remedies.

### 5.2    **Ability To Make Plan Payments.**

Because the Debtors are liquidating and will not have continued operations, there will be no future earnings or other future income of the Debtors. However, the Debtors currently have sufficient Cash on hand to pay the Unsecured Noteholder Claims and the General Unsecured

Claims, and following receipt of the Material Australian Dividend, the Debtors will have sufficient Cash to distribute funds on account of Equity Interests in accordance with the Plan. The Debtors are complying with this requirement as they are liquidating all of their Assets and the proceeds thereof will be used to satisfy Allowed Claims, including through Distributions of the Plan Administrator Assets. Any further Distributions to Creditors or Holders of Equity Interests is wholly dependent on any positive recovery from the prosecution of Causes of Action, if any, and/or further dividends from the Australian Administration, if any.

## ARTICLE 6

## LIQUIDATION ANALYSIS

Because the Plan (i) contemplates a liquidation process, and (ii) provides that the Creditors will be paid in full, a liquidation analysis is unnecessary.

## ARTICLE 7

## NO DISCHARGE OF DEBTORS

In accordance with § 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive any discharge of debt in these Chapter 11 Cases.

## ARTICLE 8

## PROVISIONS GOVERNING DISTRIBUTIONS

### 8.1    Distribution on Account of Claims Allowed as of the Effective Date.

Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, Distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; *provided that*: (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Confirmation Date shall be paid in accordance with the Section 2 of the Plan; (b) in accordance with Section 2 of the Plan, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; and (c) Allowed Unsecured Noteholder Claims and Allowed General Unsecured Claims shall be paid in accordance with Section 2.2 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

### 8.2    Distribution on Account of Claims Allowed After the Effective Date.

(a) *Payments and Distributions on Disputed Claims*. Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, Distributions under the Plan on account

of Disputed Claims that become Allowed after the Effective Date shall be made on the next Distribution Date; *provided that* (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Confirmation Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims and paid in accordance with Article 2 of the Plan.

(b) *Special Rules for Distributions to Holders of Disputed Claims*. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no payments or Distributions shall be made with respect to a Disputed Claim and/or Disputed Equity Interest until all such disputes in connection with such Disputed Claim and/or Disputed Equity Interest have been resolved by settlement or agreement among the relevant parties, or by Final Order.

### 8.3    Timing and Calculation of Amounts to Be Distributed.

Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim and an Allowed Equity Interest shall receive the full amount of the Distributions that the Plan provides for with respect to Allowed Claims and Allowed Equity Interests in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims and Equity Interests shall **not** be entitled to post-petition interest, dividends, or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### 8.4    Delivery of Distributions.

Except as otherwise provided herein, the Plan Administrator shall make Distributions to Holders of Allowed Claims and Allowed Equity Interests as of the Effective Date, or, if applicable, to such Holder's designee, as appropriate: (1) at the address for each such Holder as indicated in the Debtors' books and records; (b) to the signatory set forth on any Proof of Claim or Proof of Equity Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Equity Interest is Filed or if the Debtors have not been notified in writing of a change of address); (3) at the addresses set forth in any written notices of address changes delivered to the Debtors or the Plan Administrator, as appropriate, after the date of any related Proof of Claim or Proof of Equity Interest; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided, that* the manner of such Distributions shall be determined at the discretion of the Debtors or Plan Administrator, as applicable.

### 8.5    Distributions by the Plan Administrator.

The Plan Administrator shall have the authority to facilitate the Distributions required hereunder.  To the extent the Debtors or the Plan Administrator, as applicable, determine to utilize

a Distribution Agent, then the Debtors or the Plan Administrator, as applicable, shall pay to such Distribution Agent, all reasonable and documented fees and expenses incurred by Distribution Agent without the need for any approvals, authorizations, actions, or consents. To the extent the Debtors or the Plan Administrator, as applicable, determine to utilize a Distribution Agent, such Distribution Agent shall submit detailed invoices to the Debtors or the Plan Administrator, as applicable, for all fees and expenses for which such the Distribution Agent seeks reimbursement. The Debtors or the Plan Administrator, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Plan Administrator, as applicable, deem to be unreasonable. In the event that the Debtors or the Plan Administrator, as applicable, object to all or any portion of the amounts requested to be reimbursed in such Distribution Agent's invoice, the Debtors or the Plan Administrator, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Plan Administrator, as applicable, and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard and resolved by the Bankruptcy Court.

**8.6     Undeliverable Distributions.**

(a) *Holders of Certain Undeliverable Distributions*. If any Distribution to a Holder of an Allowed Claim or an Allowed Equity Interest made in accordance herewith is returned to the Debtors (or the Plan Administrator or the Distribution Agent, if any, as the case may be) as undeliverable, no further Distributions shall be made to such Holder. Undeliverable Distributions shall remain in the possession of the Debtors or the Plan Administrator, subject to Section 8.6(b) of the Plan, until such time as any such Distributions become deliverable or are deemed undeliverable in accordance with Article 8.6(b) of the Plan. Undeliverable Distributions shall not be entitled to any additional funds of the Estates on account of their Distribution being undeliverable.

(b) *Failure to Claim Undeliverable Distributions*. Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of the initial attempted Distribution. After such date, all unclaimed property or interest in property shall revert to the Plan Administrator to be maintained for redistribution on a *pro rata* basis to other parties entitled to Distributions under the Plan, and the Claim of any other party to such property or interest in property shall be discharged and forever barred. Neither the Debtors, the Plan Administrator, or the Distribution Agent, if any, shall have any obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings by such Holder or its designee with the Bankruptcy Court.

(c) *Failure to Present Checks*. Checks issued by the Debtors (or, as the case may be, the Plan Administrator or the Distribution Agent, if any) on account of Allowed Claims or Allowed Equity Interests shall be null and void if not negotiated within ninety (90) days after the issuance of such check. Any Holder of an Allowed Claim or an Allowed Equity Interest holding an unnegotiated check that does not request reissuance of such unnegotiated check within ninety (90) days after the date of mailing or other delivery of such check shall have its Claim for such unnegotiated check discharged and shall be forever barred, estopped and enjoined from asserting

any such Claim against the Debtors or their property. Within ninety (90) days after the mailing or other delivery of any such Distribution checks, notwithstanding applicable escheatment Laws, all such Distributions shall revert to the Plan Administrator to be maintained for redistribution to other parties on a *pro rata* basis entitled to Distributions under the Plan. Nothing contained herein shall require the Debtors, the Plan Administrator, or the Distribution Agent, if any, to attempt to locate any Holder of an Allowed Claim or an Allowed Equity Interest other than the attempts made through the Solicitation Motion and those conducted prior to the Petition Date.

(d) *Insufficient Information Regarding Holders of Equity Interests*. If, after the Debtors have exhausted reasonable efforts to obtain contact information for all Holders of Equity Interests (*e.g.*, reaching out through the Portal hosted by Carta, sending mass emails through Outlook, and publishing the forthcoming Publication notice in United States of America and Australia), the Debtors or the Plan Administrator, as applicable, still do not have (i) sufficient information to attempt to make a Distribution to a Holder of Equity Interests, or (ii) the required documents as set forth in Section 8.8 below, that Holder's Distribution will be held in trust for a period not to exceed ninety (90) days. If after ninety (90) days, there is still insufficient information regarding such Holder or if such Holder does not come forward and claim such Distribution, their Distribution shall revert to the Plan Administrator to be maintained for redistribution to other parties, on a *pro rata* basis, entitled to Distributions under the Plan, and the Holder's interest in that Distribution shall be discharged and forever barred.

**8.7** **De Minimis Distributions.**

Notwithstanding anything herein to the contrary, the Plan Administrator shall not be required to make a Distribution if the amount to be distributed is or has an economic value of less than fifty dollars ($50.00). Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions to the other Holders of Equity Interests.

**8.8** **Compliance with Tax Requirements/Allocations.**

In connection with the Plan, to the extent applicable, the Debtors and Plan Administrator shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. The Debtors and Plan Administrator shall be entitled to retain the services of a certified public accountant to provide tax advice to the Debtors and Plan Administrator regarding the withholding of funds required to pay taxes or that may be required to pay taxes and the preparation and filing of any necessary forms or tax returns. Notwithstanding any provision in the Plan to the contrary, the Debtors and the Plan Administrator (or the Distribution Agent, if any) shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including (a) liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes (b) withholding distributions pending receipt of information necessary to facilitate such distributions including the appropriate Internal Revenue Service W-8 or W-9 forms and, in the absence of receipt of such information within a reasonable period of time, deeming such Claims to be waived without further Order of the Court, or (c) establishing any other mechanisms they believe are reasonable and appropriate. If the Debtors and the Plan Administrator (or the Distribution Agent, if any) request that the Holder of an Allowed Claim complete the appropriate Internal Revenue

Service W-8 or W-9 form and the Holder fails to comply before the date that is ninety (90) days after the request is made, the amount of such Distribution shall irrevocably revert to the Debtors and any Claim in respect of such Distribution shall be disallowed and forever barred from receiving a Distribution under the Plan. The Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

**8.9    No Post-Petition Interest on Allowed Claims.**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, post-petition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a pre-petition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE 9

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS OR EQUITY INTERESTS

**9.1    Disputed Claims Process.**

Except as otherwise provided in this Plan, Holders of Claims shall not be required to File a Proof of Claim, and no parties should File a Proof of Claim. All Filed Proofs of Claim shall be deemed objected to and Disputed without further action by the Debtors; *provided, however*, that the Debtors and the Plan Administrator, as applicable, reserve the right to object to any Claim that is entitled, or deemed to be entitled, to a Distribution under this Plan or is rendered Unimpaired under this Plan. Instead, the Debtors intend to make Distributions, as required by this Plan, in accordance with the books and records of the Debtors. For the avoidance of doubt, the Plan does not intend to impair or otherwise impact the rights of Holders of General Unsecured Claims or Unsecured Noteholder Claims.

**If any such Holder of a Claim disagrees with the Debtors' books and records with respect to the Allowed amount of such Holder's Claim, such Holder must so advise the Debtors and the Plan Administrator in writing within thirty (30) days of receipt of any Distribution on account of such Holder's Claim, in which event the Claim shall become a Disputed Claim. The Debtors and the Plan Administrator intend to attempt to resolve any such disputes consensually or through judicial means outside these Chapter 11 Cases and jurisdiction of the Bankruptcy Court as if these Chapter 11 Cases were never commenced.**

Nevertheless, the Debtors or the Plan Administrator may, in their discretion, File with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the Allowance of any Claim or any other appropriate motion or adversary proceeding with respect thereto. All such

objections shall be litigated to a Final Order; *provided, however*, that the Debtors or Plan Administrator may compromise, settle, withdraw, or resolve by any other method approved by the Bankruptcy Court any objections to Claims.

**Except as otherwise provided herein or in the Confirmation Order, all Proofs of Claim Filed before or after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, without the need for any objection by the Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 9.2    Disputed Equity Interest Process.

Except as otherwise provided in this Plan, Holders of Equity Interests shall not be required to File a Proof of Equity Interest, and no parties should File a Proof of Equity Interest. All Filed Proofs of Interest relating to Equity Interests shall be deemed objected to and Disputed without further action by the Debtors; *provided, however*, that the Debtors and the Plan Administrator, as applicable, reserve the right to object to any Equity Interest. Instead, the Debtors intend to make Distributions on account of Equity Interests, as required by this Plan, in accordance with the books and records of the Debtors.

**If any such Holder of an Equity Interest disagrees with the Debtors' books and records with respect to the Allowed amount of such Holder's Equity Interest, which will be listed in a schedule annexed to the Plan Supplement, such Holder must so advise the Debtors, the proposed counsel to the Debtors, and the Plan Administrator in writing <u>within thirty (30) days of the Confirmation Date</u>, in which event the Equity Interest shall become a Disputed Equity Interest. The Debtors and the Plan Administrator intend to attempt to resolve any such disputes consensually or through judicial means outside these Chapter 11 Cases and jurisdiction of the Bankruptcy Court as if these Chapter 11 Cases were never commenced.**

Nevertheless, the Debtors or the Plan Administrator may, in their discretion, File with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the Allowance of any Equity Interest or any other appropriate motion or adversary proceeding with respect thereto. All such Filed objections shall be litigated to a Final Order; provided, however, that the Debtors or Plan Administrator may compromise, settle, withdraw, or resolve by any other method approved by the Bankruptcy Court any objections to Equity Interests.

**Except as otherwise provided herein or in the Confirmation Order, all Proofs of Equity Interest Filed before or after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, without the need for any objection by the Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 9.3    Allowance of Claims and Equity Interests.

Except as expressly provided herein or by any order entered in the Chapter 11 Cases on or before the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall be

deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under (i) the Bankruptcy Code, (ii) as set forth in this Plan, or (iii) the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code.  Except as expressly provided in any order entered in the Chapter 11 Cases on or before the Effective Date (including the Confirmation Order), the Debtors and the Plan Administrator, as the case may be, after Confirmation shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest as of the Petition Date.

**9.4** **Claims and Equity Interests Administration Responsibilities.**

From and after the Effective Date, the Plan Administrator shall have the exclusive authority to File, settle, compromise, withdraw or litigate to judgment any objections to Claims or Equity Interests as permitted under this Plan.  From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim or Disputed Equity Interest without approval of the Bankruptcy Court.  The Debtors and the Plan Administrator shall administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.  The Debtors and the Plan Administrator also reserve the right to resolve any Disputed Claim or Disputed Equity Interest in an appropriate forum outside the jurisdiction of the Bankruptcy Court under applicable governing law.

## ARTICLE 10

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**10.1** **Conditions Precedent to the Effective Date.**

The Effective Date shall not occur unless and until each of the following conditions have occurred in accordance with the terms herein or have been waived in accordance with Section 10.2 of the Plan:

a.  the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order;

b.  the Professional Fee Escrow Account is funded in accordance with this Plan; and

c.  the releases, exculpation and injunction provided for under the Plan shall have been approved by the Bankruptcy Court.

**10.2** **Waiver of Conditions Precedent.**

The Debtors may waive any of the conditions to the Effective Date set forth in Section 10.1 of the Plan at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**10.3** **Reservation of Rights.**

The Plan shall have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors or the Plan Administrator, as applicable, with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

**10.4** **Substantial Consummation of Plan.**

"Substantial consummation" of the Plan, as defined in section 1101(2)(c) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE 11

## GENERAL PROVISIONS

**11.1** **Title to Assets.**

If the Plan is confirmed under section 1191(a) of the Bankruptcy Code, except as otherwise provided in the Plan or in the order confirming the Plan, (i) Confirmation of the Plan vests all of the property of the Estates in the Debtors, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests.

If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, property of the Estate includes, in addition to the property specified in section 541 of the Bankruptcy Code, all property of the kind specified in that section that the Debtors acquire, as well as any additional dividends received by Creativemass, after the Confirmation Date but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first.

As set forth in the Plan, but subject to any exception set forth in the Confirmation Order, all property of the Estates shall vest with the Plan Administrator for Distribution in accordance with the terms of the Plan.

**11.2** **Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Plan Administrator, any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted this Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in this Plan, each Person acquiring property under this Plan.

### 11.3     Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 11.4     Retention of Subject Matter Jurisdiction.

The proposed Confirmation Order will provide that the Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193 of the Bankruptcy Code; (iii) to hear and allow all applications for compensation to Professionals and other Administrative Expense Claims; (iv) to resolve all issues regarding any outstanding Claims or Equity Interest objections; (v) to adjudicate any Cause of Action which may exist in favor of the Debtors, including Avoidance Actions; and (vi) to hear any other matter not inconsistent with the provisions of the Bankruptcy Code.

### 11.5     Captions.

The headings contained in this Plan are for convenience of reference only and do not affect the meanings or interpretation of this Plan.

### 11.6     Modification of Plan.

The Debtors may modify the Plan at any time before Confirmation of the Plan pursuant to section 1193(a) of the Bankruptcy Code.  However, the Bankruptcy Court may require conditions to doing so.

If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, the Debtors or Plan Administrator, as applicable, may seek to modify the Plan at any time only if the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 11.7     Final Decree.

Once the Estates have been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Administrator, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Cases.  Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

### 11.8     Compromise and Settlement of Claims and Controversies.

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of such Allowed

Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

**11.9    Releases by the Debtors.**

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtors and the consummation of the transactions contemplated by this Plan, on the Effective Date, the Released Parties are deemed forever released by the Debtors and their Estates, and each of their successors and assigns, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the business or contractual arrangements between the Debtors and any of the Released Parties, the negotiation, formulation or preparation of this Plan, any Plan Supplement or related agreements, instruments or other documents (collectively, the "Debtors' Released Claims"), other than Debtors' Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such Person or entity.

**11.10    Releases by Holders of Claims.**

**On the Effective Date, except as otherwise provided herein and except for the right to enforce this Plan, each Releasing Party, shall, to the fullest extent permitted by applicable law, be deemed to forever release and waive the Released Parties of and from all liens, claims, causes of action, liabilities, encumbrances, security interests, interests or charges of any nature or description whatsoever based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases or affecting property of the Estates, whether known or unknown, suspected or unsuspected, scheduled or unscheduled, contingent or not contingent, unliquidated or fixed, admitted or disputed, matured or unmatured, senior or subordinated, whether assertable directly or derivatively by, through, or related to any of the Released Parties and their successors and assigns whether at law, in equity or otherwise, based upon any condition, event, act, omission occurrence, transaction or other activity, inactivity, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date in any way relating to or arising out of, in whole or in part, the Debtors, the Debtors' prepetition operations, governance, financing, or fundraising, the purchase or sale of the Debtors' securities, the Note to Equity Conversion, the Chapter 11 Cases, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan, including without limitation, the formulation, preparation, negotiation, solicitation (of votes, releases, or otherwise), filing, or dissemination of this Plan, all regardless of whether (a) a Proof of Claim has been filed or is deemed to have been filed,**

**(b) such Claim is allowed, or (c) the Holder of such Claim has voted to accept or reject this Plan, except for willful misconduct, gross negligence, fraud or criminal misconduct. Nothing contained herein shall impact the right of any Holder of an Allowed Claim to receive a Distribution on account of its Allowed Claim in accordance with this Plan.**

**11.11   Exculpation.**

**None of the Debtors, Mr. Ulrich, Mr. Gonzalez, Ms. Springer, Pashman, Novo, any other Professionals, or the Subchapter V Trustee (collectively, the "Exculpated Parties") shall have or incur any liability to any Holder of a Claim or Equity Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Debtors' Chapter 11 Cases, except for willful misconduct, gross negligence, fraud or criminal misconduct as determined by a Final Order of a court of competent jurisdiction, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.**

**11.12   Injunction Related to Third Parties.**

**From and after the Effective Date, to the extent of the releases and exculpation granted in this Plan, all Holders of Claims or Equity Interests shall be permanently enjoined from commencing or continuing in any manner against the Debtors, the Plan Administrator and their or its professionals, the Released Parties and the Exculpated Parties and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to this Plan.   Except as otherwise expressly provided in this Plan, the Plan Supplement or related documents, or for obligations issued pursuant to this Plan, all Persons who have held, hold or may hold Claims or Equity Interests that have been released or are subject to exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such Persons on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting or enforcing any encumbrance of any kind against such Persons or the property or estates of such Persons on account of or in connection with or with respect to any such Claims or Equity Interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released or settled pursuant to this Plan.**

**11.13   Term of Injunctions or Stays.**

Unless otherwise provided in this Plan or the Confirmation Order, all injunctions or stays provided for under this Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan or the Confirmation Order, as applicable.

## ARTICLE 12

## ATTACHMENTS

The following documents are deemed to be part of the Plan:

- The Australian Liquidators' Sixth Creditor Report, a true and correct copy is attached hereto as **Exhibit A**.

## ARTICLE 13

## FREQUENTLY ASKED QUESTIONS

**What are the Debtors Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11. The plan is the legal document that sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a plan of liquidation, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If the Holders of Equity Interests are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtors, the Bankruptcy Court may confirm the Plan as proposed by the Debtors.

**How Do I Determine Which Class I Am In?** The Table of Contents will direct you to the treatment provided to the Class in which you are grouped. The pertinent section of the Plan dealing with that Class will explain, among other things, who is in that Class, what is the size of the Class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. Section 2.2 lists Classes of Claimants and their types of Claims and or Equity Interests.

**Why Is Confirmation of a Plan of Liquidation Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtors and all of its Creditors are bound by the

terms of the Plan.  If the Plan is not confirmed, the Debtors may not pay Creditors as proposed in the Plan while the Debtors remain in bankruptcy.

**What Is Necessary to Confirm a Plan of Liquidation?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two- thirds in total dollar amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is Impaired under, and has not accepted, the Plan.

**Am I Entitled to Vote on the Plan?** Any Creditor or Holder of Equity Interest of the Debtors whose claim is IMPARIED under the Plan is entitled to vote, if either (i) the Plan sets forth the Creditor's or Holder of Equity Interest' treatment and Distribution; (ii) the Creditor's or Holder of Equity Interest's claim has been scheduled by the Debtors and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the Creditor or Holder of Equity Interest has filed a Proof of Claim and/or Proof of Equity interest or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the Creditor's or Holder of Equity Interest's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** The Chart in Section 2.2 identifies the Classes of Claims and Equity Interests and indicates which Classes are Impaired and entitled to vote.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to all Creditor or Holders of Equity Interests for their review, consideration and approval. The deadline by which ballots must be returned is May 6, 2025. Ballots shall be **received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline.**

**To cast your vote, please either:**

**(i) complete and execute the paper Ballot and return it using the first-class mail pre-addressed postage pre-paid return envelope provided with the Ballot or by submitting it by overnight courier or hand delivery to the following address:**

**Creativemass, et al., Ballot Processing**
**c/o Stretto**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

**-OR-**

**(ii) complete and submit the Ballot by upload via the Claims, Noticing, and Solicitation Agent's online portal at https://cases/stretto.com/Creativemass. Click on the "File a Ballot"**

**section of the website and follow the instructions to submit the Ballot by upload.**

**How Do I Determine When and How Much I Will Be Paid?** In Article 2 of the Plan, the Debtors have set forth summaries of what it anticipates each Class of Claims and Equity Interests will receive under the Plan.

## ARTICLE 14

## DEFINITIONS

### A.    Scope of Definitions.

For purposes of this Plan, unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article 11 of this Plan.  The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.  The definitions that follow that are found in the Bankruptcy Code are set forth for convenience of reference only, and are superseded by the definition found in the Bankruptcy Code to the extent of any variation.

### B.    Definitions.

**14.1**    **"ABC"** shall have the same meaning ascribed to it in section 1.7 of the Plan.

**14.2**    **"ABC Petition"** shall have the same meaning ascribed to it in section 1.7 of the Plan.

**14.3**    **"Administrative Expense Bar Date"** shall apply to Administrative Expense Claims and means the first Business Day that is thirty (30) days after the Effective Date or such other date as established by Final Order of the Bankruptcy Court.

**14.4**    **"Administrative Expense Claim"** or **"Administrative Claim"** means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including without limitation: (a) any actual and necessary costs and expenses incurred on or after the Commencement Date of preserving the Estates and operating the Debtors' businesses prior to the Effective Date; (b) Claims that have been determined by a Final Order to constitute an administrative expense of the Estate; (c) Professional Fee Claims; and (d) any fees or charges assessed against and payable by the Debtors under section 1930 of title 28 of the United States Code.

**14.5**    **"Allowed"** or **"Allowance"** means, as to a Claim or an Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law; provided, however that the

Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

**14.6** **"Allowed Claim"** means (a) a Claim on the books and records of the Debtors as of the Commencement Date, (b) any Claim against the Debtors, proof of which is timely filed or by order of the Bankruptcy Court is not or will not be required to be filed, (c) any Claim that has been or is hereafter listed in the Schedules (if filed) as neither disputed, contingent or unliquidated, and for which no timely filed Proof of Claim has been filed, or (d) any Claim allowed pursuant to this Plan and, in each such case in (b) and (c) above, as to which either (i) no objection to the allowance thereof has been filed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (ii) such an objection is so filed and the Claim shall have been allowed pursuant to a Final Order (but only to the extent so allowed).

**14.7** **"Allowed Priority Tax Claim"** means a Priority Tax Claim to the extent that it is or has become and Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtors or Debtors-in-Possession shall be entitled on the Confirmation Date.

**14.8** **"Allowed General Unsecured Claim"** means an unsecured claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtors or Debtors-in-Possession shall be entitled on the Confirmation Date.

**14.9** **"AMP"** shall have the meaning ascribed to it in Section 1.7 of the Plan.

**14.10** **"Assets"** means all assets and property of the Estates of the Debtors, regardless of whether reflected in the financial records of the Debtors, including but not limited to: Cash, deposits, refunds, rebates, abatements, fixtures, equipment, inventory, contractual interests, intangibles, claims, Causes of Action, suits, setoffs, recoupments, equitable or legal rights, interests and remedies.

**14.11** **"ATO"** shall have the meaning ascribed to it in Section 1.7 of the Plan.

**14.12** **"Australian Administration"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.13** **"Australian Distribution Proceeds"** shall have the meaning ascribed to it in Section 1.7 of the Plan.

**14.14** **"Australian Liquidators"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.15** **"Avoidance Actions"** means the Causes of Action under sections 502(d), 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code. These may also be referred to as the "Chapter 5 Causes of Action".

14.16 **"Ballot"** means a ballot, as included in the Solicitation Package, upon which certain Holders of Impaired Equity Interests entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures set forth in the Solicitation Package.

14.17 **"Bankruptcy Code"** means title 11 of the United States Code, as amended and in effect on the Commencement Date.

14.18 **"Bankruptcy Court"** means the United States Bankruptcy Court for District of Delaware having jurisdiction over the Chapter 11 Cases.

14.19 **"Bankruptcy Rules"** means (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, and (b) the Local Rules of the Bankruptcy Court, in each case, as in effect on the Commencement Date.

14.20 **"Bar Date"** means the deadline set by the Bankruptcy Court, pursuant to a Final Order or otherwise, for filing Proofs of Claim and Proofs of Equity Interests in the Chapter 11 Case, as the context may require, which includes the Administrative Expense Bar Date. For the avoidance of doubt, (i) the Bar Date is applicable to all Creditors, Holders of Equity Interests, parties in interests, including any governmental units as defined by section 101(27) of the Bankruptcy Code, and (ii) Holders of Claims and Equity Interests as set forth in this Plan are **not** required to file a Proof of Claim or Proof of Equity Interest by the Bar Date.

14.21 **"Bridge Loans"** shall have the meaning ascribed to it in Section 1.7 of the Plan.

14.22 **"Business Day"** means any day other than: (a) a Saturday, (b) a Sunday, and (c) a "legal holiday" as defined in Bankruptcy Rule 9006(a).

14.23 **"Case" or "Cases"** has the same meaning as the term "Chapter 11 Cases."

14.24 **"Cash"** means legal tender of the United States of America.

14.25 **"Cash Funds"** shall have the meaning ascribed to it in Section 1.4 of the Plan.

14.26 **"Causes of Action"** means any and all actions, causes of action, rights, suits, debts, sums of money, damages, judgments, claims, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, including but not limited to the Avoidance Actions, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Cases, including through the Effective Date, that belong to the Debtors, the Debtors-in-Possession, or the Estates.

14.27 **"Chapter 11 Cases"** means these cases under subchapter V of chapter 11 of the Bankruptcy Code in which Creativemass and Creativemass US are the Debtors-in-Possession.

14.28 **"Claim"** means any "right to payment from the Debtors whether or not such right

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured."  11 U.S.C. § 101(5).

**14.29   "Claims, Noticing, and Solicitation Agent"** shall mean Stretto, Inc.

**14.30   "Class"** means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to section 1122 of the Bankruptcy Code.

**14.31   "Commencement Date"** means April 14, 2025.

**14.32   "Confirmation**" means the entry by the Bankruptcy Court of the Confirmation Order confirming this Plan.

**14.33   "Confirmation Date"** means the date upon which the Bankruptcy Court shall enter the Confirmation Order; *provided*, *however*, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such day or the date on which such stay expires and is no longer in effect.

**14.34   "Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider the confirmation of the Plan, as it may be adjourned or continued from time to time.

**14.35   "Confirmation Order"** means an order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**14.36   "Consolidated Debtors"** means all of the Debtors.

**14.37   "Consortium"** shall have the same meaning ascribed to it in Section 1.7 of the Plan.

**14.38   "Convertible Notes"** shall have the same meaning ascribed to it in Section 1.7 of the Plan.

**14.39   "Convertible Note Agreement"** shall have the same meaning ascribed to it in section 1.7 of the Plan.

**14.40   "Creativemass"** means Creativemass Holdings, Inc.

**14.41   "Creativemass Enterprises"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.42   "Creativemass Group"** shall have the same meaning ascribed to it in Section 1.1

of the Plan.

**14.43** "**Creativemass US**" means Creativemass Enterprises US LLC.

**14.44** "**Creditor**" has the meaning ascribed to such term in § 101(10) of the Bankruptcy Code.

**14.45** "**CRO**" shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.46** "**Debtors**" and "**Debtors-in-Possession**" means Creativemass and Creativemass US, the debtors and debtors in possession in these Chapter 11 Cases.

**14.47** "**Delaware Chancery Court**" shall have the same meaning ascribed to it in Section 1.7 of the Plan.

**14.48** "**Disallowed**" means a (a) Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) Claim or any portion thereof that is Scheduled at zero or as an unknown amount, or as contingent, disputed, and/or unliquidated, and as to which a General Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) Claim or any portion thereof that is not Scheduled and as to which a General Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

**14.49** "**Disputed Claim**" means any Claim against the Debtors pursuant to section 502 of the Bankruptcy Code which the Debtors or the Plan Administrator have in any way objected to, challenged, or otherwise disputed. *See also* Section 9.1 of the Plan for the Disputed Claims Process.

**14.50** "**Disputed Equity Interest**" means any Equity Interest that is disputed by or objected to by (i) the Holders of the Equity Interest, and/or (ii) the Debtors or the Plan Administrator, as applicable. *See also* Section 9.2 of the Plan for the Disputed Equity Interest Process.

**14.51** "**Distribution**" means a distribution of Cash, Assets or other Plan Administrator Assets made in accordance with the Plan to Holders of Allowed Claims and Allowed Equity Interests.

**14.52** "**Distribution Agent**" means the Debtors, the Plan Administrator or any Person designated by the Debtors or the Plan Administrator to make or to facilitate distributions in accordance with the Plan.

**14.53** "**Distribution Date**" means the date on which the Plan Administrator shall make a Distribution, which shall be a date, or dates, selected by the Plan Administrator in accordance with

the terms of this Plan.

**14.54** **"EBITDA"** shall mean earnings before interest, taxes, depreciation, and amortization.

**14.55** **"Effective Date"** means one (1) Business Day after the Confirmation Order becomes a Final Order, which is subject to Bankruptcy Rule 3020(e). For the avoidance of doubt, the Debtors will not be seeking a waiver of the Bankruptcy Rule 3020(e).

**14.56** **"Entity"** means an entity as defined in section 101(15) of the Bankruptcy Code.

**14.57** **"Equisolve"** shall have the meaning ascribed to it in Section 1.7 of the Plan.

**14.58** **"Equity Interest" or "Equity" or "Interest"** means an ownership interest in Creativemass.

**14.59** **"Estate" and "Estates"** means the estates created in the Debtors' Chapter 11 Cases containing all assets of the Debtors pursuant to Bankruptcy Code section 541.

**14.60** **"Exculpated Claim"** means any Claim or Causes of Action whatsoever related to any act taken or omitted after the Commencement Date and on or before the Effective Date arising out of the Chapter 11 Cases related to the Debtors and the Estates, including, without limitation, (i) the negotiation of any settlements entered into, with, or by the Debtors or any Estate representative, (ii) the formulation, preparation, dissemination, negotiation, filing, solicitation (of votes, releases, or otherwise), prosecution, approval or administration of the Plan and/or any financing, investment, or sale agreement with respect to the Debtors, and/or (iii) any contract, instrument, release, assignment, or other agreement or document created or entered into in connection with any such negotiations or settlements of the Chapter 11 Cases, or any financing agreement or settlement agreement in connection therewith, the filing of the Chapter 11 Cases, the pursuit of Confirmation, and the administration and implementation of the Plan.

**14.61** **"Exculpated Party" or "Exculpated Parties"** shall have the meaning ascribed to it in Article 11.11 of the Plan.

**14.62** **"Executory Contract"** means all unexpired leases and executory contracts as described in section 365 of the Bankruptcy Code.

**14.63** **"File"** means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. **"Filed"** and **"Filing"** shall have correlative meanings.

**14.64** **"Final Order"** means an order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**14.65** **"General Unsecured Claim"** shall have the same meaning ascribed to it in Section

1.5 of the Plan.

**14.66** **"Holder"** means the beneficial holder of any Claim or Equity Interest, in its capacity as such.

**14.67** **"Impaired"** shall have the meaning ascribed to it in section 1124 of the Bankruptcy Code.

**14.68** **"Insider"** or **"Insiders"** shall have the meaning ascribed to it in section 101(31) of the Bankruptcy Code, plus all entities under common control with the Debtors as of the Petition Date.

**14.69** **"Intercompany Claims"** shall mean claims between Debtors.

**14.70** **"Japanese Bankruptcy Funds"** shall have the meaning ascribed to it in Section 1.8 of the Plan.

**14.71** **"Liabilities"** means the liabilities of the Estates, whether or not reflected in the financial records of the Debtors.

**14.72** **"Lien"** shall have the meaning ascribed to it in § 101(37) of the Bankruptcy Code, except that a lien that has been or may be avoided or void shall not constitute a Lien for the purposes of the Plan.

**14.73** **"Local Rules"** means the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware.

**14.74** **"Material Australian Dividend"** shall have the same meaning ascribed to it in Section 1.8 of the Plan.

**14.75** **"Michael Rouse's Equity"** shall mean the any and all known Equity Interest(s) Michael Rouse held, including, but not limited to, Michael Rouse's Equity Interests held by Creativemass Hong Kong Limited (a company which Michael Rouse founded and owned, which held a large portion of Creativemass shares). For the avoidance of doubt, no distribution or payment will be made to Creativemass Hong Kong Limited or Michael Rouse.

**14.76** **"Note to Equity Conversion"** shall have the meaning ascribed to it in Section 1.7 of the Plan.

**14.77** **"Novo"** shall have the meaning ascribed to it in Section 1.7 of the Plan.

**14.78** **"Opt-In Deadline"** is the same as the Voting Deadline.

**14.79** **"Opt-In Form"** shall mean the form where Holders of Claims and Equity Interests can elect to opt into the Release Provisions included in the Plan by checking a prominently featured and clearly labeled box.

**14.80**  **"Ordinary Unsecured Creditor"** or **"Ordinary Unsecured Creditors"** shall mean an ordinary unsecured creditor as defined by Australian insolvency law.

**14.81**  **"Pashman"** shall have the meaning ascribed to it in Section 1.8 of the Plan.

**14.82**  **"Person"** means a person as defined in § 101(41) of the Bankruptcy Code.

**14.83**  **"Petition Date"** means the date the Debtors file their respective voluntary petitions for relief with the Bankruptcy Court, and is also the Commencement Date.

**14.84**  **"Plan"** means this plan of liquidation for the resolution of outstanding Claims and Equity Interests in the Case, as may be modified, amended, or supplemented at any time in accordance with the Bankruptcy Code, Bankruptcy Rules, and the terms hereof, including all exhibits, supplements, and appendices hereto.

**14.85**  **"Plan Administrator"** means the person selected by the Debtors, as set forth in the Plan Supplement. All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets.

**14.86**  **"Plan Administrator Assets"** means all assets held from time to time by the Debtors, including the Cash Funds and the future Material Australian Dividend, that are to be administered by the Plan Administrator in order to make distributions pursuant to the Plan.

**14.87**  **"Plan Administrator Expenses"** shall have the same meaning ascribed to it in Section 3.4 of the Plan.

**14.88**  **"Plan Supplement"** means the compilation of documents and information to be filed at least seven (7) calendar days before the deadline to object to the Plan, and any additional documents or schedules filed before the Effective Date as supplements or amendments to the Plan Supplement.  The Debtors shall have the right to add to and amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

**14.89**  **"Priority Tax Claim"** means any Claim of a governmental unit (as that term is defined in the Bankruptcy Code) of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**14.90**  **"Professional"** means any person or Entity employed by the Debtors in accordance with sections 327 or 328 of the Bankruptcy Code, and who shall be compensated for services rendered prior to and including the Confirmation Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code. For the avoidance of doubt, upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate.

**14.91**  **"Professional Fee Bar Date"** shall apply to Professional Fee Claims and means

the first Business Day that is forty-five (45) days after the Confirmation Date or such other date established by Final Order of the Bankruptcy Court.

**14.92  "Professional Fee Claims"** shall mean an Administrative Claim for reasonable compensation of a Professional for services rendered or expenses incurred in these Chapter 11 Cases on or prior to the Confirmation Date.

**14.93  "Professional Fee Escrow Account"** shall mean an account funded by the Debtors with Cash as soon as practicable after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

**14.94  "Professional Fee Escrow Amount"** shall mean the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article 2.1 of the Plan.

**14.95  "Proof of Claim"** means a "proof of claim," as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs or expenses made pursuant to section 503 of the Bankruptcy Code Filed in any of the Debtors' Chapter 11 Cases.  For the avoidance of doubt, Holders of Claims are **not** required to file a Proof of Claim by the General Claims Bar Date to receive a Distribution under the Plan.

**14.96  "Proof of Equity Interest"** means a proof of interest form, made pursuant to Rules 3002 and 3003 Filed in any of the Debtors' Chapter 11 Cases.  For the avoidance of doubt, Holders of Equity Interests listed in the Plan Supplement are **not** required to file a Proof of Proof of Equity Interest by the General Claims Bar Date to receive a Distribution under the Plan.

**14.97  "R&D Claim"** shall have the same meaning ascribed to it in Section 1.7 of the Plan.

**14.98  "Record Date"** means the record date for determining the entitlement to vote on the Plan, which date was April 8, 2025.

**14.99  "Released Party"** means each of the following: (a) the Debtors; and (b) the Debtors' current officers and directors, which include Alex Ulrich, Rodrigo Gonzalez and Claudia Springer.  For the avoidance of doubt, Michael Rouse is **not** included in the definition of Released Party.

**14.100 "Releasing Party"** means each Person who affirmatively marked the box on the Opt-In Form electing to opt into granting the releases provided under this Plan.

**14.101 "SBRA"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.102 "Schedules and Statements"** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor pursuant to § 521 of the Bankruptcy Code, as

such schedules and statement have been or may be supplemented or amended from time to time. Please be advised that the Debtors shall seek an extension, and an ultimate waiver, of the requirement to file Schedules and Statements in the Chapter 11 Cases.

**14.103 "Sixth Creditor Report"** shall have the same meaning ascribed to it in Section 1.8 of the Plan.

**14.104 "Solicitation Date"** means April 8, 2025.

**14.105 "Solicitation Packages"** means the solicitation materials provided by Claims, Noticing, and Solicitation Agent to Holders of Equity Interests to accept or reject the Plan.

**14.106 "Stackup"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.107** "**Subchapter V Trustee" or "Trustee"** means the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), the Plan, or the order confirming the Plan.

**14.108 "Subsidiaries"** or **"Subsidiary"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.109 "Sydney Syndicate"** shall have the same meaning ascribed to it in Section 1.7 of the Plan.

**14.110 "Trust and Assignment Agreement"** shall have the same meaning ascribed to it in Section 1.7 of the Plan.

**14.111 "Unimpaired"** means an Allowed Claim or Equity Interest that is not Impaired.

**14.112 "United States Trustee" or "U.S. Trustee"** means the United States Trustee appointed under section 591 of title 28 of the United States Code to serve in the District of Delaware.

**14.113 "Unsecured Noteholder Claim"** shall have the same meaning ascribed to it in Section 1.5 of the Plan.

**14.114 "Voting Deadline"** shall mean May 6, 2025 or such other date as the Court orders. This date is the same date that the Opt-In Forms must be returned.

**14.115 "Wealthconnect (Japan)"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

**14.116 "Wealthconnect UK"** shall have the same meaning ascribed to it in Section 1.1 of the Plan.

Dated: April 8, 2025                    Respectfully submitted,

                                        DEBTORS
                                        Creativemass Holdings, Inc. and
                                        Creativemass Enterprises US LLC

                                        By: */s/ Claudia Z. Springer*
                                        Name: Claudia Z. Springer
                                        Chief Restructuring Officer

**<u>EXHIBIT A</u>**

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**

**Formerly known as Creativemass Enterprises Pty Ltd**

**A.C.N. 619 665 628**

**A.B.N. 86 619 665 628 ("the Company")**

hogan sprowles

**Sixth Report to Creditors**

31 March 2025

A.C.N. 619 665 628 Pty Ltd (In Liquidation) formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628 ("the Company")
31 March 2025

## CONTENTS

1.  Executive Summary ...................................................................................................... 4
2.  First Interim Dividend to Ordinary Unsecured Creditors ............................................ 5
3.  Update on the Liquidation ........................................................................................... 5
4   Receipts and Payments ................................................................................................ 7
5   Costs of the Liquidation .............................................................................................. 7
6   What happens next? ..................................................................................................... 8
7   Where can you get more information? ......................................................................... 8

### Annexures

| | |
|---|---|
| **Annexure A** | Proof of Debt form |
| **Annexure B** | ARITA - Creditors Rights in Liquidation |
| **Annexure C** | Notice of Intention to Declare an Interim Dividend to Ordinary Unsecured Creditors and Notice inviting formal proof of debt or claim |
| **Annexure D** | Remuneration Report |
| **Annexure E** | Information Sheet – Proposals without meetings |
| **Annexure F** | Proposal 1 – Liquidators' current remuneration |
| **Annexure G** | Proposal 2 – Liquidators' future remuneration |

A.C.N. 619 665 628 Pty Ltd (In Liquidation) formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628 ("the Company")
31 March 2025

## ABBREVIATIONS

| | |
|---|---|
| Act | Corporations Act 2001 |
| Administrators | Christian Sprowles and Michael Hogan |
| ARITA | Australian Restructuring Insolvency and Turnaround Association |
| ASIC | the Australian Securities & Investments Commission |
| ATO | Australian Taxation Office |
| CBA | Commonwealth Bank of Australia |
| Company | A.C.N. 619 665 628 Pty Ltd (In Liquidation) Formerly Creativemass Enterprises Pty Ltd |
| Department | Department of Employment and Workplace Relations |
| DoCA | Deed of Company Arrangement |
| ERV | Estimated Realisable Value |
| EOI | Expression of Interest |
| FEG | Fair Entitlements Guarantee |
| FEG Act | Fair Entitlements Guarantee Act 2012 |
| FY | Financial Year |
| Liquidators | Christian Sprowles and Michael Hogan |
| ROCAP | Report on Company Activities and Property |
| YTD | Year to Date |

A.C.N. 619 665 628 Pty Ltd (In Liquidation) formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628 ("the Company")
31 March 2025

## 1.  Executive Summary

### 1.1  Liquidators' update

Michael Hogan and I were appointed as Joint and Several Liquidators of the Company on 28 April 2023 pursuant to a resolution passed by creditors. This superseded our appointment as Joint and Several Administrators on 15 March 2023.

This report should be read in conjunction with our previous reports to creditors dated 17 March 2023, 19 April 2023, 8 May 2023, 28 July 2023 and 25 March 2024.

The purpose of this report is to provide an update to creditors and to provide notice of our intention to declare a second and interim dividend to ordinary unsecured creditors.

In our last report to creditors, we notified creditors of our intention to declare a first and interim dividend to ordinary unsecured creditors at a rate of 14 cents in the dollar on 20 May 2024. We confirm that this dividend was paid to ordinary unsecured creditors on or around this date. We can also advise creditors that the FY23 R&DTI claim and tax return was successfully lodged with the ATO. The Company received circa $1.9M in relation to the FY23 R&DTI refund claim.

The Company commenced proceedings against the former director, Michael Rouse (**Mr Rouse**) and Stratstone Fossk Pty Ltd (**Stratstone**) in the Federal Court of Australia. On 29 August 2024, the Court made orders in favour of the Company against Mr Rouse and Stratstone. The orders mean that Mr Rouse is liable to pay the Company $1.87M plus prejudgement interest while Stratstone is liable to pay the Company $432K plus prejudgement interest.

A Committee of Inspection meeting was held on 6 November 2024. At this meeting, it was unanimously agreed by Committee Members that a bankruptcy notice be issued to Mr Rouse and a statutory demand be issued to Stratstone. An update on the bankruptcy notice and the statutory demand is provided at Section 3 of this report.

The notice of our intention to declare a second and interim dividend to ordinary unsecured creditors is provided at **Annexure C**.

If creditors have any queries regarding the report, please contact Tom Farquhar of my office on 02 9707 0927 or by email at tfarquhar@hogansprowles.com.au.

### 1.2  The purpose of this report is to:

- Provide you with an update on the progress of the liquidation;
- Notice of intention to declare a second and interim dividend to ordinary unsecured creditors;
- Approve the liquidator's remuneration and disbursements; and
- Notice inviting formal proof of debt or claim.

If creditors have not already done so, you are requested to complete and submit to this office a proof of debt form (attached as **Annexure A**).

Creditors have the right to request a meeting or information that complies with the guidelines set out in the ARITA information sheet "Creditors Rights in Liquidation" (attached as **Annexure B**). We do not propose to hold a meeting of creditors at this time.

Creditors must complete and return remuneration proposal forms (attached as **Annexure F-G**) to Tom Farquhar at tfarquhar@hogansprowles.com.au by **Wednesday, 30 April 2025**. Should you have any queries in relation to this matter, please contact Tom Farquhar on (02) 9707 0927.

## 2.    Second Interim Dividend to Ordinary Unsecured Creditors

We are declaring an interim dividend to ordinary unsecured creditors to be paid on or around **Monday, 26 May 2025** at the estimated rate of 11 cents in the dollar. A notice of the dividend is attached as **Annexure C.**

We will be distributing $3.9M on circa $35M of creditor claims (subject to formal adjudication).

Ordinary unsecured creditors of the Company are required on or before **5pm (AEST) on Monday, 21 April 2025** to formally prove their debts or claims by delivering or posting to me at my address, or via email to tfarquhar@hogansprowles.com.au, a formal proof of debt or claim in accordance with Form 535 containing their respective debts or claims. A notice inviting formal proof of debt or claim is attached as **Annexure C**.

**If you have already submitted a proof of debt or claim form for the first and interim dividend to ordinary unsecured creditors, and there have been no changes to your debt or claim, you do not need to resubmit the form.**

Should creditors have any queries regarding the dividend process, please contact Tom Farquhar of my office on 02 9707 0927 or by email at tfarquhar@hogansprowles.com.au.

## 3.    Update on the Liquidation

**Debts owing from Mr Rouse and Stratstone**

On 27 May 2024, a directions hearing was held into the debt owing from Mr Rouse and Stratstone to the Company and the matter was set down for a final hearing to be held on 16 July 2024. Orders were also made granting us to issue subpoenas to various financial institutions to obtain bank account and transaction details of Mr Rouse.

The matter was heard on 13 August 2024 and the defendants did not appear.

On 29 August 2024, the Court delivered judgement in favour of the Company and the following orders were made:

- Pursuant to section 588FF(1)(h) of the Corporations Act, clauses 6.3 and 6.4 of the Exit Deed were, void or alternatively, unenforceable from 8 February 2023

- Pursuant to section 588FF(1)(a) of the Corporations Act:

  a)   The defendants, Stratstone, pay the Company $431,665 plus prejudgement interest;
  b)   Mr Rouse pay the Company $1,873,935 plus prejudgement interest; and

- The defendants pay the plaintiffs' costs as agreed or assessed.

A.C.N. 619 665 628 Pty Ltd (In Liquidation) formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628 ("the Company")
31 March 2025

On 6 November 2024 a Committee of Inspection meeting was held where it was agreed by Committee Members that I would issue a statutory demand to Stratstone for recovery of the judgement debt and lodge an application to issue a bankruptcy notice to Mr Rouse for his judgement debt.

On or around 11 December 2024, a bankruptcy notice for Mr Rouse was lodged with the Australian Financial Security Authority (AFSA).

On 14, 16 and 18 January 2025, a process server attempted to effect service of the bankruptcy documents on Mr Rouse. On 23, 28 January 2025 and 2 February 2025, a process server attempted to effect service of the bankruptcy documents on Michael Paul Rouse at a second address.

On 18 March 2025, a substituted service application was filed in the Federal Court of Australia. We are waiting for the Court to provide us with a date for the matter to be heard.

On 4 February 2025, a Creditor's Statutory Demand was served on Stratstone requiring Stratstone Fossk to pay the Judgement Debt.

Stratstone did not respond or comply with the demand. On 18 March 2025, an application to wind up Stratstone was filed in the Federal Court of Australia. The winding up application will be heard on 14 May 2025.

## 3.1   Declaration of Independence, Relevant Relationships and Indemnities

Our Initial Information for Creditors dated 17 March 2023 included a Declaration of Independence, Relevant Relationships and Indemnities (**"DIRRI"**) signed by me as Administrator of the Company. There have been no changes to the position disclosed in the DIRRI.

Based on the estimated position as at the date of this report, ordinary unsecured creditors will receive a return which remains in line with the estimated position outlined in our Administrators' Report.

We are continuing our investigations and pursue of recoveries available to the liquidator. Should there be any material changes, we will provide creditors with an update in any subsequent report to creditors.

A.C.N. 619 665 628 Pty Ltd (In Liquidation) formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628 ("the Company")
31 March 2025

## 4    Receipts and Payments

A summary of the Liquidators' Receipts & Payments account is displayed below.

| Receipts and Payments Period: 2 March 2024 to 30 March 2025 | Amount ($) |
|---|---|
| **Opening Cash at Bank** | **8,113,554** |
| | |
| **Receipts** | |
| Debtor | 67,657 |
| Interest Received | 245,984 |
| ATO - R&D Refund | 1,892,094 |
| Dividend Unclaimed | 1,285 |
| | **2,207,020** |
| | |
| **Payments** | |
| Payroll Tax | 36,257 |
| Consulting Fees | 2,500 |
| Interest Paid | 5,427 |
| Professional Fees | 97,053 |
| BAS Payable | 184,405 |
| Dividend Paid | 4,900,954 |
| Legal Fees | 249,347 |
| Liquidator's Remuneration | 384,316 |
| Liquidator's Disbrusements | 1,111 |
| | **5,861,370** |
| | |
| **Cash at Bank** | **4,459,204** |

## 5   Costs of the Liquidation

To date we have incurred unbilled time totalling $62,801, excluding GST.

Our remuneration is higher than originally forecast due to several reasons including:

- Adjudication of ordinary unsecured creditor claims, and the administrative time involved in processing the first and interim dividend to ordinary unsecured creditors;

- Additional time and expenses attempting to locate former director, Mr Rouse and obtaining information relevant to the claim;

- Creditor correspondence, including liaising with Novo Advisers who have been appointed in a similar capacity to HoganSprowles but over Creativemass Holdings Inc.;

- Scheduling and convening Committee of Inspection meetings regarding the progress of the liquidation and recovery actions against Mr Rouse and Stratstone Fossk;

- Bank reconciliation and BAS; and

- Preparing reports to creditors.

We will be seeking current and future remuneration approval from creditors via proposal without a meeting of $62,801 and $30,000, excluding GST, respectively.

A.C.N. 619 665 628 Pty Ltd (In Liquidation) formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628 ("the Company")
31 March 2025

- **Annexure F** – Approve the current remuneration of the Liquidator of $62,801, excluding GST; and
- **Annexure G** – Approve the future remuneration of the Liquidator of $30,000, excluding GST.

Creditors must complete and return remuneration proposal forms (attached as **Annexure F-G**) to Tom Farquhar at tfarquhar@hogansprowles.com.au by **Wednesday, 30 April 2025**. Should you have any queries in relation to this matter, please contact Tom Farquhar on (02) 9707 0927.

## 6   What happens next?

We will proceed with the liquidation, including, but not limited to:

- Attend to the claims and queries regarding liquidation;
- Investigating and pursuing recoveries;
- Completing my reporting to the corporate insolvency regulator, ASIC;
- Any other matters relevant to the liquidation;
- Payment of interim dividend to ordinary unsecured creditors;
- Payment of further dividends to ordinary unsecured creditors; and
- Finalisation of the Liquidation.

## 7   Where can you get more information?

You can access information which may assist you on the following websites:

- ARITA at www.arita.com.au/creditors
- ASIC at www.asic.gov.au (search for "insolvency information sheets").

Should you have any queries, please contact Tom Farquhar on 02 9707 0927 or by email on tfarquhar@hogansprowles.com.au.

Yours faithfully,

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**

~~Christian Sprowles~~
Joint & Several Liquidator

**Annexure A**

FORM 535
CORPORATIONS ACT 2001

ACN 619 665 628

Subregulation 5.6.49(2)

**FORMAL PROOF OF DEBT OR CLAIM (GENERAL FORM)**

To the Liquidator of ACN 619 665 628 Pty Ltd (In Liquidation) formerly known as Creativemass Enterprises Pty Ltd:

1.      This is to state that the company was, on 15 March 2023 [1] and still is, justly and truly indebted to [2] (full name):

        ...................................................................................................................................................
        ('Creditor')

        ...................................................................................................................................................
        of (full address)

        for $ ....................................................................................dollars and ...........................................cents.

Particulars of the debt are:

| Date | Consideration [3] state how the debt arose | Amount $ | GST included $ | Remarks [4] include details of voucher substantiating payment |
|---|---|---|---|---|
|  |  |  |  |  |

2.      To my knowledge or belief the creditor has not, nor has any person by the creditor's order, had or received any manner of satisfaction or security for the sum or any part of it except for the following:        ...................................................................

        Insert particulars of all securities held.  Where the securities are on the property of the company, assess the value of those securities.  If any bills or other negotiable securities are held, specify them in a schedule in the following form:

| Date | Drawer | Acceptor | Amount $ | Due Date |
|---|---|---|---|---|
|  |  |  |  |  |

        ☐    I am **not** a related creditor of the Company [5]

        ☐    I am a related creditor of the Company [5]
             relationship:_____

3A. [6]*    I am employed by the creditor and authorised in writing by the creditor to make this statement.  I know that the debt was incurred for the consideration stated and that the debt, to the best of my knowledge and belief, still remains unpaid and unsatisfied.

3B. [6]*    I am the creditor's agent authorised to make this statement in writing.  I know that the debt was incurred and for the consideration stated and that the debt, to the best of my knowledge and belief, still remains unpaid and unsatisfied.

DATED this                     day of                          202

Signature of Signatory ...................................................................................................................

NAME IN BLOCK LETTERS ...........................................................................................................

Occupation.....................................................................................................................................

Address..........................................................................................................................................

**See Directions overleaf for the completion of this form**

OFFICE USE ONLY

| | | | |
|---|---|---|---|
| POD No: |  | ADMIT (**Voting / Dividend**) - Ordinary | $ |
| Date Received: | / / | ADMIT (**Voting / Dividend**) – Preferential | $ |
| Entered into CORE IPS: |  | Reject (**Voting / Dividend**) | $ |
| Amount per CRA/RATA | $ | Object or H/Over for Consideration | $ |
| **Reason for Admitting / Rejection** |  |  |  |
| PREP BY/AUTHORISED |  | **TOTAL PROOF** |  |
| DATE AUTHORISED         / / |  |  | $ |

**Proof of Debt Form Directions**

\*            Strike out whichever is inapplicable.

(1)          Insert date of Court Order in winding up by the Court, or date of resolution to wind up, if a voluntary winding up.

(2)          Insert full name and address (including ABN) of the creditor and, if applicable, the creditor's partners.  If prepared by an employee or agent of the creditor, also insert a description of the occupation of the creditor.

(3)          Under "Consideration" state how the debt arose, for example "goods sold and delivered to the company between the dates of ……………………………………………", "moneys advanced in respect of the Bill of Exchange".

(4)          Under "Remarks" include details of vouchers substantiating payment.

(5)          Related Party / Entity: Director, relative of Director, related company, beneficiary of a related trust.

(6)          If the Creditor is a natural person and this proof is made by the Creditor personally. In other cases, if, for example, you are the director of a corporate Creditor or the solicitor or accountant of the Creditor, you sign this form as the Creditor's authorised agent (delete item 3A). If you are an authorised employee of the Creditor (credit manager etc), delete item 3B.

**Annexures**

A.          If space provided for a particular purpose in a form is insufficient to contain all the required information in relation to a particular item, the information must be set out in an annexure.

B.          An annexure to a form must:

      **(a)**          have an identifying mark;

      **(b)**          and be endorsed with the words:

      i)          "This is the annexure of *(insert number of pages)* pages marked *(insert an identifying mark)* referred to in the *(insert description of form)* signed by me/us and dated *(insert date of signing)*; and

      **(c)**          be signed by each person signing the form to which the document is annexed.

C.          The pages in an annexure must be numbered consecutively.

D.          If a form has a document annexed the following particulars of the annexure must be written on the form:

      **(a)**          the identifying mark; and

      **(b)**          the number of pages.

E.          A reference to an annexure includes a document that is with a form.



# Creditor Rights in Liquidations

As a creditor, you have rights to request meetings and information or take certain actions:



| Right to request a meeting | Right to request information | Right to give directions to liquidator | Right to appoint a reviewing liquidator | Right to replace liquidator |

## Right to request a meeting

In liquidations, no meetings of creditors are held automatically. However, creditors with claims of a certain value can request in writing that the liquidator hold a meeting of creditors.

A meeting may be requested in the first 20 business days in a creditors' voluntary liquidation by ≥ 5% of the value of the debts held by known creditors who are not a related entity of the company.

Otherwise, meetings can be requested at any other time or in a court liquidation by:

- \> 10% but < 25% of the known value of creditors on the condition that those creditors provide security for the cost of holding the meeting
- ≥ 25% of the known value of creditors
- creditors by resolution, or
- a Committee of Inspection (this is a smaller group of creditors elected by, and to represent, all the creditors).

If a request complies with these requirements and is 'reasonable', the liquidator must hold a meeting of creditors as soon as reasonably practicable.

## Right to request information

Liquidators will communicate important information with creditors as required in a liquidation. In addition to the initial notice, you should receive, at a minimum, a report within the first three months on the likelihood of a dividend being paid.

Additionally, creditors have the right to request information at any time. A liquidator must provide a creditor with the requested information if their request is 'reasonable', the information is relevant to the liquidation, and the provision of the information would not cause the liquidator to breach their duties.

A liquidator must provide this information to a creditor within 5 business days of receiving the request, unless a longer period is agreed.  If, due to the nature of the information requested, the liquidator requires more time to comply with the request, they can extend the period by notifying the creditor in writing.

**Requests must be reasonable.**

**They are not reasonable if:**

Both meetings and information:

(a)  complying with the request would prejudice the interests of one or more creditors or a third party
(b)  there is not sufficient available property to comply with the request
(c)  the request is vexatious

Meeting requests only:

(d)  a meeting of creditors dealing with the same matters has been held, or will be held within 15 business days

Information requests only:

(e)  the information requested would be privileged from production in legal proceedings
(f)  disclosure would found an action for breach of confidence
(g)  the information has already been provided
(h)  the information is required to be provided under law within 20 business days of the request

If a request is not reasonable due to (b), (d), (g) or (h) above, the liquidator must comply with the request if the creditor meets the cost of complying with the request.

Otherwise, a liquidator must inform a creditor if their meeting or information request is not reasonable and the reason why.

Specific queries about the liquidation should be directed to the liquidator's office.

AUSTRALIAN RESTRUCTURING INSOLVENCY & TURNAROUND ASSOCIATION



## Right to give directions to liquidator

Creditors, by resolution, may give a liquidator directions in relation to a liquidation. A liquidator must have regard to these directions, but is not required to comply with the directions.

If a liquidator chooses not to comply with a direction given by a resolution of the creditors, they must document their reasons.

An individual creditor cannot provide a direction to a liquidator.

## Right to appoint a reviewing liquidator

Creditors, by resolution, may appoint a reviewing liquidator to review a liquidator's remuneration or a cost or expense incurred in a liquidation. The review is limited to:

- remuneration approved within the six months prior to the appointment of the reviewing liquidator, and
- expenses incurred in the 12 months prior to the appointment of the reviewing liquidator.

The cost of the reviewing liquidator is paid from the assets of the liquidation, in priority to creditor claims.

An individual creditor can appoint a reviewing liquidator with the liquidator's consent, however the cost of this reviewing liquidator must be met personally by the creditor making the appointment.

## Right to replace liquidator

Creditors, by resolution, have the right to remove a liquidator and appoint another registered liquidator.

For this to happen, there are certain requirements that must be complied with:

| Meeting request | Information and notice | Resolution at meeting |
|---|---|---|
| A meeting must be reasonably requested by the required number of creditors.<br><br>Creditors must inform the existing liquidator of the purpose of the request for the meeting. | Creditors must determine who they wish to act as the new liquidator (this person must be a registered liquidator) and obtain:<br><br>▪ Consent to Act, and<br>▪ Declaration of Independence, Relevant Relationships and Indemnities (DIRRI).<br><br>The existing liquidator will send a notice of the meeting to all creditors with this information. | If creditors pass a resolution to remove a liquidator, that person ceases to be liquidator once creditors pass a resolution to appoint another registered liquidator. |

**For more information, go to www.arita.com.au/creditors.**
**Specific queries about the liquidation should be directed to the liquidator's office.**

FORM 547
CORPORATIONS ACT 2001

Subregulation 5.6.65(1)

NOTICE TO ORDINARY CREDITOR OR PERSON CLAIMING TO BE A ORDINARY CREDITOR OF

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**
**Formerly known as Creativemass Enterprises Pty Ltd**
**ACN 619 665 628 ("the Company")**

INTENTION TO DECLARE A SECOND INTERIM DIVIDEND

A second interim dividend is to be declared to ordinary creditors on Monday, 26 May 2025 for the Company.

You are listed as an ordinary creditor in the report on the affairs of the Company, or you are known to me to claim to be an ordinary creditor, but your debt or claim has not yet been admitted.

You are required formally to prove your debt or claim on or before 5pm (AEST) on Monday, 21 April 2025 by delivery to our address at PO BOX R181 Royal Exchange Sydney NSW 1225 or via email to tfarquhar@hogansprowles.com.au. If you do not, you will be excluded from the benefit of the dividend.

A Formal Proof of Debt form is enclosed.

DATED this the 31st day of March 2025

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**

Christian Sprowles
**Joint and Several Liquidator**

HoganSprowles
PO BOX, R181 Royal Exhange,
SYDNEY  NSW  1225

FORM 534
CORPORATIONS ACT 2001

Subregulation 5.6.48(2) and (3)

NOTICE INVITING FORMAL PROOF OF DEBT OR CLAIM

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**
**Formerly known as Creativemass Enterprises Pty Ltd**
**ACN 619 665 628 ("the Company")**

Take notice that creditors of the Company, whose debts or claims have not already been admitted, are required on or before 5pm (AEST) on Monday, 21 April 2025 to prove their debts or claims by delivering or posting to me (us) at my (our) address a formal proof of debt or claim in accordance with Form 535 containing their respective debts or claims. If they do not, they will be excluded from:

    a.   the benefit of any distribution made before their debts or claims are proved; and

    b.   objecting to the distribution.

Form of proof may be obtained from me.

DATED this the 31st day of March 2025

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**

Christian Sprowles
**Joint and Several Liquidator**

HoganSprowles
PO BOX, R181 Royal Exhange,
SYDNEY  NSW  1225

**Annexure D**

**Remuneration Report**

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**
**Formerly known as Creativemass Enterprises Pty Ltd**
**A.C.N. 619 665 628 ("the Company")**

This remuneration report provides you with the information you need to be able to make an informed decision regarding the approval of my remuneration for undertaking the Liquidation.

**Table of Contents**

Part 1:     Declaration

Part 2:     Executive Summary

Part 3:     Description of work completed / to be completed

Part 4:     Calculation of Remuneration

Part 5:     Statement of Remuneration Claim

Part 6:     Likely impact on dividends

Part 7:     Disbursements

Part 8:     Report on Progress of the Liquidation

Part 9:     Summary of Receipts and Payments

Part 10:    Queries

Part 11:    Information Sheet

To minimise the costs in the administration and this liquidation, I have elected to seek the approval of creditors for my remuneration and internal disbursements without a meeting. Information about the proposals without a meeting process is included at part 8 of this report.

You can cast your vote by using the included voting form. This form needs to be returned to my office by post, scanned and emailed or faxed. I need to receive your forms **by Wednesday, 30 April 2025** for your vote to count. If you choose to use post, please allow enough time for your letter to be delivered.

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025



If you have any questions, or need any assistance with understanding the materials I have sent to you, please contact Tom Farquhar of my office on (02) 9707 0927 or via email at tfarquhar@hogansprowles.com.au.

**Part 1:  Declaration**

I, Christian Sprowles, and Michael Hogan of HoganSprowles, have undertaken a proper assessment of this remuneration claim for my appointment as Joint and Several Liquidators of A.C.N. 619 665 628 Pty Ltd (In Liquidation), formerly known as Creativemass Enterprises Pty Ltd, in accordance with the law and applicable professional standards. We are satisfied that the remuneration claimed is in respect of necessary work, properly performed, or to be properly performed, in the conduct of the liquidation.

**Part 2:  Executive Summary**

Since the date of our appointment, the creditors have approved the administrators' remuneration of $392,266 and the liquidators' remuneration of $150,000 exclusive of GST. This remuneration report details approval sought for current and future fees.

| Period | Amount ex GST ($) |
|---|---|
| **Remuneration approval (Previously approved)** | |
| *Voluntary Administration – Remuneration (Previously approved)* | |
| Period: 15 March 2023 to 18 April 2023 | 342,266 |
| Period: 19 April 2023 to the conclusion of administration | 50,000 |
| **Total – Voluntary Administration Fees** | **392,266** |
| | |
| *Liquidation – Remuneration (Previously approved)* | |
| Period: from the commencement of the liquidation to the conclusion of the liquidation | 150,000 |
| Period: 28 April 2023 to 24 March 2024 | 268,193 |
| Period: 25 March 2024 to the conclusion of the liquidation | 100,000 |
| **Total – Liquidation Fees** | **518,193** |
| | |
| **Remuneration approval sought** | |
| *Liquidation – Current Remuneration* | |
| Resolution [1]: 3 September 2024 to 30 March 2025 | 62,801 |
| *Liquidation – Future Remuneration* | |
| Resolution [2]: 28 March 2025 to the conclusion of the liquidation | **30,000** |
| **Total approval sought** | **92,801** |
| | |
| **Total – Liquidation Fees Sought** | **610,994** |

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025



My fees are higher than the anticipated fees of $150,000 (exclusive of GST) for reasons outlined in section 5 of the sixth report to creditors dated 27 March 2025.

**Part 3: Description of work completed / to be completed**

**Resolution 1 – Liquidator's current remuneration for the period from 3 September 2024 to 30 March 2025**

| Task Area | General Description | Includes |
|---|---|---|
| **Assets**<br>**[3.2 hrs]**<br>**[$2,112]** | Plant and equipment | Liaising with valuers, auctioneers and interested parties.<br>Reviewing asset listings.<br>Liaise with interest parties regarding sale of assets.<br>Review and comments on sale agreement |
| | Assets subject to specific charges | Liaise with PPSR parties regarding security.<br>All tasks associated with realising a charged assets. |
| | Debtors | Correspondence with debtors<br>Reviewing the assessing debtor' ledgers<br>Reconciliation of aged debtors<br>Liaising with debt collectors and solicitors |
| | R&D Refund | Attending to R&D matters<br>Correspondence with ATO and PWC |
| **Creditors**<br>**[40.9 hrs]**<br>**[$21,833]** | Creditor Enquiries, Requests & Directions | Receive and respond to creditor enquiries.<br>Maintaining creditor request log.<br>Review and prepare correspondence to creditors and their representatives. |
| | Creditor reports | Preparation of initial report to creditors.<br>Preparation statutory report to creditors.<br>Prepared estimated position and return to creditors. |
| | Dealing with proofs of debt | Receipting and filing POD's when not related to a dividend.<br>Corresponding with OSR and ATO regarding POD when not related to a dividend. |
| | Proposals to Creditors | Preparing proposal notices and voting forms.<br>Forward notice of proposal to all known creditors.<br>Reviewing votes and determining outcome of proposal.<br>Preparation and lodgement of proposal outcome with ASIC. |
| **Investigation**<br>**[28.6 hrs]**<br>**[$11,926]** | Conducting investigations | Collection of company's books and records.<br>Reviewing company's books and records.<br>Review and preparation of company nature and history.<br>Extracting financial reports from accounting system. |

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025

**hogan sprowles**

| Task Area | General Description | Includes |
|---|---|---|
| | | Conducting and summarising statutory searches. Preparation of comparative financial statements. Preparation of deficiency statement. Review of specific transactions and liaising with directors regarding certain transactions Liaising with directors regarding certain transactions. Preparation of investigation file. Consider and review related party loans and transactions. Preparation and lodgement of supplementary report if required. |
| | ASIC Reporting | Preparing statutory investigation reports. Preparing affidavits seeking non-lodgement assistance. Liaising with ASIC. |
| | Litigation | Internal meetings to discuss status of litigation Preparing brief to solicitors Liaising with solicitors regarding recovery actions Attending to negotiations Attending to settlement matters |
| **Dividend [4.7 hrs] [$3,056]** | Processing proofs of debt (POD) | Preparation of correspondence to potential creditors inviting lodgement of POD Receipt of POD Maintain POD register Adjudicating POD Request further information from claimants re POD Preparation of correspondence to claimant advising outcome of adjudication |
| | Dividend procedures | Preparation of correspondence to creditors advising of intention to declare dividend Advertisement of intention to declare dividend Obtained clearance from ATO to allow distribution of company's assets Preparation of dividend calculation Preparation of correspondence to creditors announcing declaration of dividend Preparation of distribution Preparation of dividend file Preparation of payment vouchers to pay dividend Preparation of correspondence to creditors enclosing payment of dividend |



A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025

| Task Area | General Description | Includes |
|---|---|---|
| **Administration**<br>**[52.2 hrs]**<br>**[$23,875]** | Correspondence | With various stakeholders.<br>Liaise with director, solicitor and/or accountant to discuss financial position. |
| | Document maintenance/file review/checklist | First month, then six monthly administration reviews.<br>Filing of documents.<br>File reviews.<br>Updating checklist. |
| | Insurance | Identification of potential issues requiring attention of insurance specialists.<br>Correspondence with insurer regarding initial and ongoing insurance requirements.<br>Reviewing insurance policies.<br>Correspondence with previous brokers. |
| | Bank account administration | Preparing correspondence opening and closing accounts.<br>Requesting bank statements.<br>Bank account reconciliations.<br>Correspondence with bank regarding specific transfers. |
| | ASIC Forms and lodgements | Preparing and lodging ASIC forms.<br>Correspondence with ASIC regarding statutory forms.<br>Preparing form 525 regarding disclaimer. |
| | ATO and other statutory reporting | Notification of appointment.<br>Correspondence with ATO regarding lodgements and registration.<br>Notifying ATO of finalisation. |
| | Planning / Review | Discussions regarding status of administration. |
| | Books and records / storage | Dealing with records in storage<br>Recall records for investigations and collation of documents. |

**Resolution 2 - Liquidation' future remuneration for the period 31 March 2025 to the completion of the Liquidation**

| Task Area | General Description | Includes |
|---|---|---|
| **Creditors**<br>**[19.5 hrs]**<br>**[$8,975]** | Creditor Enquiries, Requests & Directions | Receive and respond to creditor enquiries.<br>Maintaining creditor request log.<br>Review and prepare correspondence to creditors and their representatives. |
| | Creditor reports | Preparation of initial report to creditors.<br>Preparation statutory report to creditors.<br>Prepared estimated position and return to creditors. |
| | Dealing with proofs of debt | Receipting and filing POD's when not related to a dividend. |

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025



| Task Area | General Description | Includes |
|---|---|---|
| | | Corresponding with OSR and ATO regarding POD when not related to a dividend. |
| | Proposals to Creditors | Preparing proposal notices and voting forms. Forward notice of proposal to all known creditors. Reviewing votes and determining outcome of proposal. Preparation and lodgement of proposal outcome with ASIC. |
| Investigation [8.5 hrs] [$3,829] | Conducting investigations | Collection of company's books and records. Reviewing company's books and records. Review and preparation of company nature and history. Extracting financial reports from accounting system. Conducting and summarising statutory searches. Preparation of comparative financial statements. Preparation of deficiency statement. Review of specific transactions and liaising with directors regarding certain transactions Liaising with directors regarding certain transactions. Preparation of investigation file. Consider and review related party loans and transactions. Preparation and lodgement of supplementary report if required. |
| | ASIC Reporting | Preparing statutory investigation reports. Preparing affidavits seeking non-lodgement assistance. Liaising with ASIC. |
| | Litigation | Internal meetings to discuss status of litigation Preparing brief to solicitors Liaising with solicitors regarding recovery actions Attending to negotiations Attending to settlement matters |
| Dividend [29.5 hrs] [$10,932] | Processing proofs of debt (POD) | Preparation of correspondence to potential creditors inviting lodgement of POD Receipt of POD Maintain POD register Adjudicating POD Request further information from claimants re POD Preparation of correspondence to claimant advising outcome of adjudication |

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025



| Task Area | General Description | Includes |
|---|---|---|
| | Dividend procedures | Preparation of correspondence to creditors advising of intention to declare dividend<br>Advertisement of intention to declare dividend<br>Obtained clearance from ATO to allow distribution of company's assets<br>Preparation of dividend calculation<br>Preparation of correspondence to creditors announcing declaration of dividend<br>Preparation of distribution<br>Preparation of dividend file<br>Preparation of payment vouchers to pay dividend<br>Preparation of correspondence to creditors enclosing payment of dividend |
| Administration [20.5 hrs] [$7,170] | Correspondence | With various stakeholders.<br>Liaise with director, solicitor and/or accountant to discuss financial position. |
| | Document maintenance/file review/checklist | First month, then six monthly administration reviews.<br>Filing of documents.<br>File reviews.<br>Updating checklist. |
| | Insurance | Identification of potential issues requiring attention of insurance specialists.<br>Correspondence with insurer regarding initial and ongoing insurance requirements.<br>Reviewing insurance policies.<br>Correspondence with previous brokers. |
| | Bank account administration | Preparing correspondence opening and closing accounts.<br>Requesting bank statements.<br>Bank account reconciliations.<br>Correspondence with bank regarding specific transfers. |
| | ASIC Forms and lodgements | Preparing and lodging ASIC forms.<br>Correspondence with ASIC regarding statutory forms.<br>Preparing form 525 regarding disclaimer. |
| | ATO and other statutory reporting | Notification of appointment.<br>Correspondence with ATO regarding lodgements and registration.<br>Notifying ATO of finalisation. |
| | Planning / Review | Discussions regarding status of administration. |
| | Books and records / storage | Dealing with records in storage<br>Recall records for investigations and collation of documents. |

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025



## Part 4:  Calculation of Remuneration

### Resolution 1 – Liquidator's current remuneration for the period from xx to 30 March 2025

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**
**Formerly known as Creativemass Enterprises Pty Ltd**
**A.C.N. 619 665 628**
ACTUAL HOURS INCURRED FOR THE PERIOD FROM 3 SEPTEMBER 2024 TO 30 MARCH 2025
CALCULATION OF REMUNERATION

| Employee | Position | $/hour | Total actual hours | Total ($) | Assets hrs | | Creditors hrs | | Investigation hrs | | Dividend hrs | | Administration hrs | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Christian Sprowles | Partner | 685.00 | 19.57 | 13,405 | 0.0 | 0 | 12.3 | 8,439 | 4.3 | 2,911 | 2.7 | 1,850 | 0.3 | 206 |
| Mark Brereton | Partner | 685.00 | 9.50 | 6,508 | 2.8 | 1,918 | 1.6 | 1,096 | 5.1 | 3,494 | 0.0 | 0 | 0.0 | 0 |
| Anny Ngo | Director | 633.00 | 4.60 | 2,912 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 1.6 | 1,013 | 3.0 | 1,899 |
| Tom Farquhar | Supervisor | 484.00 | 75.00 | 36,300 | 0.4 | 194 | 23.1 | 11,180 | 8.3 | 4,017 | 0.4 | 194 | 42.8 | 20,715 |
| Mark Brereton | Analyst 1 | 357.00 | 0.50 | 179 | 0.0 | 0 | 0.5 | 179 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 |
| Dominique Bui | Analyst 2 | 276.00 | 4.30 | 1,187 | 0.0 | 0 | 3.4 | 938 | 0.0 | 0 | 0.0 | 0 | 0.9 | 248 |
| Huy Le | Graduate | 249.00 | 0.80 | 199 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.8 | 199 |
| Rosie Gattas | Administration | 138.00 | 15.30 | 2,111 | 0.0 | 0 | 0.0 | 0 | 10.9 | 1,504 | 0.0 | 0 | 4.4 | 607 |
| Total | | | 129.57 | 62,801 | 3.2 | 2,112 | 40.9 | 21,833 | 28.6 | 13,926 | 4.7 | 3,056 | 52.2 | 23,873 |
| GST | | | | 6,280 | | | | | | | | | | |
| Total (Incl GST) | | | | 69,081 | | | | | | | | | | |
| Average hourly rate | | | | 485 | | | | | | | | | | |

### Resolution 2 – Liquidator's future remuneration for the period from 31 March 2025 to the conclusion of the Liquidation

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**
**Formerly known as Creativemass Enterprises Pty Ltd**
**A.C.N. 619 665 628**
ESTIMATED HOURS TO BE INCURRED FOR THE PERIOD 31 MARCH 2025 TO THE COMPLETION OF THE LIQUIDATION
CALCULATION OF REMUNERATION

| Employee | Position | $/hour | Total actual hours | Total ($) | Creditors hrs | | Investigation hrs | | Dividend hrs | | Administration hrs | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Christian Sprowles | Partner | 685.00 | 7.50 | 5,138 | 3.5 | 2,398 | 1.0 | 685 | 1.0 | 685 | 2.0 | 1,370 |
| Mark Brereton | Partner | 685.00 | 2.50 | 1,715 | 0.5 | 343 | 1.0 | 685 | 1.0 | 685 | 0.0 | 0 |
| Anny Ngo | Director | 633.00 | 3.00 | 1,899 | 0.0 | 0 | 0.5 | 317 | 1.5 | 950 | 1.0 | 633 |
| Tom Farquhar | Supervisor | 484.00 | 28.00 | 13,552 | 10.0 | 4,840 | 3.0 | 1,452 | 10.0 | 4,840 | 5.0 | 2,420 |
| Dominique Bui | Analyst 2 | 276.00 | 16.50 | 4,554 | 3.0 | 828 | 2.0 | 552 | 4.5 | 1,242 | 7.0 | 1,932 |
| Huy Le | Graduate | 249.00 | 11.00 | 2,739 | 2.0 | 498 | 0.0 | 0 | 8.5 | 2,117 | 0.5 | 125 |
| Rosie Gattas | Administration | 138.00 | 9.50 | 1,311 | 0.5 | 69 | 1.0 | 138 | 3.0 | 414 | 5.0 | 690 |
| Total | | | 78.00 | 30,905 | 19.5 | 8,975 | 8.5 | 3,829 | 29.5 | 10,932 | 20.5 | 7,170 |
| But say | | | | 30,000 | | | | | | | | |
| GST | | | | 3,000 | | | | | | | | |
| Total (Incl GST) | | | | 33,000 | | | | | | | | |
| Average hourly rate | | | | 396 | | | | | | | | |

## Part 5:  Statement of Remuneration Claim

I will be seeking approval on the following resolutions to approve my remuneration.

### Resolution 1 – Liquidator's current remuneration for the period from 3 September 2024 to 30 March 2025

> *"That the current remuneration of the Liquidator from 3 September 2024 to 30 March 2025 is determined at a sum equal to the cost of time spent by the Liquidator, and the Liquidator's partners and staff, calculated at the hourly rates as detailed in the remuneration report dated 31 March 2025 such sum to be capped at the amount of $62,801, exclusive of GST, and that the Liquidator may draw the remuneration on a monthly basis or as required."*

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025

**hogan sprowles**

**Resolution 2 – Liquidator's future remuneration for the period from 31 March 2025 to the conclusion of the liquidation**

> *"That the future remuneration of the Liquidator from 31 March 2025 to the conclusion of the liquidation is determined at a sum equal to the cost of time spent by the Liquidator, and the Liquidator's partners and staff, calculated at the hourly rates as detailed in the remuneration report dated 31 March 2025 such sum to be capped at the amount of $30,000, exclusive of GST, and that the Liquidator may draw the remuneration on a monthly basis or as required."*

**Part 6: Likely impact on dividends**

Please see the Report to Creditors dated 31 March 2025.

**Part 7: Report on Progress of the Liquidation**

Please see the Report to Creditors dated 31 March 2025.

**Part 8: Summary of Receipts and Payments**

Please see the Report to Creditors dated 31 March 2025.

**Part 9: Queries**

If you have any queries in relation to the information in this report, please contact Tom Farquhar on (02) 9707 0927 or via email at tfarquhar@hogansprowles.com.au. You can also access information which may assist you on the following websites:

- ARITA at www.arita.com.au/creditors; and
- ASIC at www.asic.giv.au (search for "insolvency information sheets").

**Part 11: Information Sheet**

The ASIC information sheet, approving fees: A guide for creditors can be found at http://download.asic.gov.au/media/1310767/Approving_fees_guide_for_creditors.pdf

Dated this **the 31st day of March 2025**

Christian Sprowles
**Joint & Several Liquidator**

A.C.N. 619 665 628 Pty Ltd (In Liquidation)
Formerly known as Creativemass Enterprises Pty Ltd
A.C.N. 619 665 628
Sixth Report to Creditors dated 31 March 2025





Schedule of rates as @ 1 July 2024

Private & Confidential

| Title | Description | Hourly rate (Excl. GST) ($) |
|---|---|---|
| Partner | Registered liquidator, Chartered Accountant, degree qualified with more than fifteen years of extensive experience in insolvency, restructuring and business advisory experience. Leads engagements with full accountability for strategy and execution. | 685 |
| Director | Generally Chartered Accountant and degree qualified with more than ten years of experience. Extensive experience in managing large, complex engagements at a senior level. Autonomously leads complex insolvency appointments reporting to Partner. | 633 |
| Senior Manager | Generally Chartered Accountant and degree qualified with more than seven years of experience. Significant experience across all types of engagements. Self-sufficiently conducts small to medium insolvency appointments. | 575 |
| Manager | Generally Chartered Accountant and degree qualified with more than five years of experience. Experience in complex matters, day to day conduct of small to medium engagements. Assists senior staff on complex matters. | 518 |
| Supervisor | Generally Chartered Accountant and degree qualified with more than three years of experience. Assists senior staff in planning and conduct of small to large engagements. Supervise a small team and control small engagements. | 484 |
| Senior Analyst 1 | Generally degree qualified and undertaking Chartered Accountant's qualification. Controls certain tasks on small engagements and assists staff with completing tasks on medium to large engagements. | 426 |
| Senior Analyst 2 | Experienced graduate controlling certain tasks on small engagements. Assists senior staff in completing tasks on small to large engagements. | 414 |
| Analyst 1 | Experienced graduate. Required to assists senior staff in completing tasks on small to large engagements. | 357 |
| Analyst 2 | Generally a university graduate with appropriate qualifications. Assists with day to day tasks under the supervision of senior staff. | 276 |
| Graduate | Generally degree qualified and undertaking or about to undertake Chartered Accountant's qualification with less than one year of experience. Assists with day to day tasks under the supervision of senior staff. | 249 |
| Undergraduate | Undertaking relevant degree. Assists with tasks within workstreams and appointments under supervision. | 218 |
| Senior Bookkeeper | Experienced bookkeeper with more than 18 months experience.  Assist senior staff with accounting functions of engagement. | 218 |
| Bookkeeper | Assist senior staff with accounting functions of engagement. | 195 |
| PA | Appropriate skills and experience to support professional staff in an administrative capacity. | 173 |
| Administration | Appropriate skills and experience to support professional staff in an administrative capacity. | 138 |



# Information sheet: Proposals without meetings

You may be a creditor in a liquidation, voluntary administration or deed of company arrangement (collectively referred to as an external administration).

You have been asked by the liquidator, voluntary administrator or deed administrator (collectively referred to as an external administrator) to consider passing a proposal without a meeting.

This information sheet is to assist you with understanding what a proposal without a meeting is and what your rights as a creditor are.

## What is a proposal without a meeting?

Meetings of creditors were previously the only way that external administrators could obtain the views of the body of creditors. However, meetings can be very expensive to hold.

A proposal without a meeting is a cost effective way for the external administrator to obtain the consent of creditors to a particular course of action.

## What types of proposals can be put to creditors?

The external administrator is able to put a range of proposals to creditors by giving notice in writing to the creditors. There is a restriction under the law that each notice can only contain a single proposal. However, the external administrator can send more than one notice at any single time.

## What information must the notice contain?

The notice must:

- include a statement of the reasons for the proposal and the likely impact it will have on creditors if it is passed
- invite the creditor to either:
  - vote yes or no to the proposal, or
  - object to the proposal being resolved without a meeting, and
- specify a period of at least 15 business days for replies to be received by the external administrator.

If you wish to vote or object, you will also need to lodge a Proof of Debt (POD) to substantiate your claim in the external administration. The external administrator will provide you with a POD to complete. You should ensure that you also provide documentation to support your claim.

If you have already lodged a POD in this external administration, you do not need to lodge another one.

The external administrator must also provide you with enough information for you to be able to make an informed decision on how to cast your vote on the proposal. With some types of proposals, the law or ARITA's Code of Professional Practice sets requirements for the information that you must be provided.

**ARITA**
ACN 002 472 362      Level 5, 191 Clarence Street, Sydney NSW 2000 Australia  |  GPO Box 4340, Sydney NSW 2001
**t** +61 2 8004 4344  |  **e** admin@arita.com.au  |  **arita.com.au**

AUSTRALIAN RESTRUCTURING INSOLVENCY & TURNAROUND ASSOCIATION



For example, if the external administrator is asking you to approve remuneration, you will be provided with a Remuneration Approval Report, which will provide you with detailed information about how the external administrator's remuneration for undertaking the external administration has been calculated.

## What are your options if you are asked to vote on a proposal without a meeting?

You can choose to vote yes, no or object to the proposal being resolved without a meeting.

## How is a resolution passed?

A resolution will be passed if more than 50% in number and 50% in value (of those creditors who did vote) voted in favour of the proposal, but only so long as not more than 25% in value objected to the proposal being resolved without a meeting.

## What happens if the proposal doesn't pass?

If the proposal doesn't pass and an objection is not received, the external administrator can choose to amend the proposal and ask creditors to consider it again or the external administrator can choose to hold a meeting of creditors to consider the proposal.

The external administrator may also be able to go to Court to seek approval.

## What happens if I object to the proposal being resolved without a meeting?

If more than 25% in value of creditors responding to the proposal object to the proposal being resolved without a meeting, the proposal will not pass even if the required majority vote yes. The external administrator will also be unable to put the proposal to creditors again without a meeting.

You should be aware that if you choose to object, there will be additional costs associated with convening a meeting of creditors or the external administrator seeking the approval of the Court. This cost will normally be paid from the available assets in the external administration.

This is an important power and you should ensure that it is used appropriately.

## Where can I get more information?

The Australian Restructuring Insolvency and Turnaround Association (ARITA) provides information to assist creditors with understanding external administrations and insolvency.

This information is available from ARITA's website at artia.com.au/creditors.

ASIC also provides information sheets on a range of insolvency topics. These information sheets can be accessed on ASIC's website at asic.gov.au (search for "insolvency information sheets").

---

### NOTICE OF PROPOSAL TO CREDITORS

**Dated: 31 March 2025**                                   **Voting Poll Closes: 30 April 2025**

---

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**
**Formerly known as Creativemass Enterprises Pty Ltd**
**A.C.N. 619 665 628 ("the Company")**

**Proposal No. 1 for creditor approval**

> "That the current remuneration of the Liquidators from 3 September 2024 to 30 March 2025 is determined at a sum equal to the cost of time spent by the Liquidator, their partners and staff, calculated at the hourly rates as detailed in the Liquidator's Remuneration Report dated 31 March 2025 such sum to be capped at the amount of $62,801, exclusive of GST, and that the Liquidators may draw the remuneration on a monthly basis or as required".

**Vote on the Proposal No. 1**

Please select the appropriate Yes, No or Object box referred to below with a ☑ to indicate your preferred position.

| | | |
|---|---|---|
| Yes | ☐ | I approve the proposal |
| No | ☐ | I do not approve the proposal |
| Object | ☐ | I object to the proposal being resolved without a meeting of creditors |

For your vote to count, your claim against the Company must have been admitted for the purposes of voting by the Joint and Several Liquidators.  Please select the option that applies to you:

☐ I have previously submitted a proof of debt form and supporting documents

☐ I have **enclosed** a proof of debt form and supporting documents with this proposal form

☐ I am **not** a related creditor of the Company

☐ I am a related creditor of the Company*

relationship:_____

**\***eg Director, relative of Director, related company, beneficiary of a related trust.

Continued: **No. 1**

**Reasons for the proposal and the likely impact it will have on creditors if it is passed**

- A Liquidator is entitled to be fairly remunerated for undertaking statutory and other duties, including reporting obligations in acting as a liquidator.
- We are unable to pay our remuneration without the approval of the Committee of Inspection (if one has been appointed), Creditors, or the Court.
- Approval by Creditors is efficient and timely, and is less costly than an application to the Court.
- Approval of our remuneration will allow us to progress further investigations in a timely manner to ensure the prospect of any dividends can be maximised.
- Approval by Creditors, by circulating resolution from the Notice of Proposal to Creditors, is less costly than convening a meeting of creditors to obtain remuneration approval.
- This may negatively impact on creditors, as a formal meeting of creditors may be convened later than it may otherwise be convened, or not convened at all. That said, creditors are welcome to contact the Liquidators staff, by email or telephone, for an update on the liquidation.

**Name of creditor / authorised person:** _____

**Address:** _____

**Signature:** _____  **Date:** _____

For your vote to count, you **must complete** this document and return it together with any **supporting documents** by no later than close of business on **Wednesday, 30 April 2025,** by email to **Tom Farquhar** at tfarquhar@hogansprowles.com.au. Should you have any queries in relation to this matter, please contact Tom Farquhar on (02) 9707 0927.

HoganSprowles
Level 9
60 Pitt Street
SYDNEY NSW 2000

---

**NOTICE OF PROPOSAL TO CREDITORS**

**Dated: 31 March 2025**                                    **Voting Poll Closes: 30 April 2025**

---

**A.C.N. 619 665 628 Pty Ltd (In Liquidation)**
**Formerly known as Creativemass Enterprises Pty Ltd**
**A.C.N. 619 665 628 ("the Company")**

**Proposal No. 2 for creditor approval**

"That the future remuneration of the Liquidators from 31 March 2025 to the completion of the liquidation is determined at a sum equal to the cost of time spent by the Liquidator, their partners and staff, calculated at the hourly rates as detailed in the Liquidator's Remuneration Report dated 31 March 2025 such sum to be capped at the amount of $30,000, exclusive of GST, and that the Liquidators may draw the remuneration on a monthly basis or as required".

**Vote on the Proposal No. 2**

Please select the appropriate Yes, No or Object box referred to below with a ☑ to indicate your preferred position.

Yes        ☐        I approve the proposal

No         ☐        I do not approve the proposal

Object     ☐        I object to the proposal being resolved without a meeting of creditors

For your vote to count, your claim against the Company must have been admitted for the purposes of voting by the Joint and Several Liquidators.  Please select the option that applies to you:

☐        I have previously submitted a proof of debt form and supporting documents

☐        I have **enclosed** a proof of debt form and supporting documents with this proposal form

☐        I am **not** a related creditor of the Company

☐        I am a related creditor of the Company*

relationship:_____

*eg Director, relative of Director, related company, beneficiary of a related trust.

Continued: **No. 2**

**Reasons for the proposal and the likely impact it will have on creditors if it is passed**

- A Liquidator is entitled to be fairly remunerated for undertaking statutory and other duties, including reporting obligations in acting as a liquidator.
- We are unable to pay our remuneration without the approval of the Committee of Inspection (if one has been appointed), Creditors, or the Court.
- Approval by Creditors is efficient and timely, and is less costly than an application to the Court.
- Approval of our remuneration will allow us to progress further investigations in a timely manner to ensure the prospect of any dividends can be maximised.
- Approval by Creditors, by circulating resolution from the Notice of Proposal to Creditors, is less costly than convening a meeting of creditors to obtain remuneration approval.
- This may negatively impact on creditors, as a formal meeting of creditors may be convened later than it may otherwise be convened, or not convened at all. That said, creditors are welcome to contact the Liquidators staff, by email or telephone, for an update on the liquidation.

**Name of creditor /
authorised person:** _____

**Address:**

_____

**Signature:** _____    **Date:** _____

For your vote to count, you **must complete** this document and return it together with any **supporting documents** by no later than close of business on **Wednesday, 30 April 2025,** by email to **Tom Farquhar** at **tfarquhar@hogansprowles.com.au.** Should you have any queries in relation to this matter, please contact Tom Farquhar on (02) 9707 0927.

HoganSprowles
Level 9
60 Pitt Street
SYDNEY NSW 2000